The **BOSTON FIVE CENTS SAVINGS BANK, Plaintiff, Appellant,**

v.

**SECRETARY OF the DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al., Defendants, Appellees.**

**No. 84–2050.**

United States Court of Appeals, First Circuit.

Heard June 17, 1985.
Decided July 19, 1985.

---

Stewart T. Herrick with whom Harrison & Maguire, P.C., was on brief for plaintiff, appellant.

M. Frederick Pritzker with whom Elizabeth A. Ritvo and Brown, Rudnick, Freed & Gesmer, were on brief for defendant, appellee Kenmore Tower Corp.

James G. Bruen, Jr., with whom Efrain Rivera, Attys., Civil Div., Dept. of Justice, Richard K. Willard, Acting Asst. Atty. Gen., William F. Weld, U.S. Atty., Frederick Dashiell, Asst. U.S. Atty., and Melvin Belin, Office of Gen. Counsel, Dept. of Housing and Urban Development, were on brief for appellee Secretary of the U.S. Dept. of Housing and Urban Development.

Before CAMPBELL, Chief Judge, and RUBIN * and BREYER, Circuit Judges.

BREYER, Circuit Judge.

This suit by The Boston Five Cents Savings Bank against the Department of Housing and Urban Development (HUD) and Kenmore Tower Corporation arises out of HUD's approval of Kenmore's conversion of its ordinary rental apartments to 'cooperatively owned' apartments. The Bank wants a declaratory judgment stating that the conversion violates the mortgage agreement between Kenmore and the Bank—a mortgage that the Department of Housing and Urban Development (HUD) has guaranteed. *See* § 207 of the National Housing Act, 12 U.S.C. § 1713. The Bank claims that the conversion violates three clauses in the agreement:

a. Clause 2, forbidding the mortgagor "to permit or suffer the use of any of the property for any purpose other than the use for which the same was intended at the time this Mortgage was executed";

b. Clause 12, forbidding the mortgagor "to create or permit to be created against the property subject to this mortgage any lien or liens inferior or superior to the lien of this Mortgage"; and

c. Clause 4, assigning "all rents, profits and income ... to the Mortgagee for the purpose of discharging the debt ... [but granting] permission ... [to the] Mortgagor as long as no default exists ... to collect such rents, profits and income for use...."

The Bank argues that the conversion violates Clause 2 because it would change the "use ... of the property." It claims the conversion violates Clause 12 because the purchasers of the cooperative apartments have borrowed the money needed to buy them and have pledged their interests in the apartments as security, thereby creating "against the property ... [a] lien ... inferior ... to the ... mortgage." It claims that conversion violates Clause 4 because, in the Bank's view, conversion means an end to payment of rents, thereby impairing the security that the Clause offers the Bank. The Bank also argued below that HUD could not, consistent with governing statutes, grant Kenmore permission to carry out the conversion. *See* 12 U.S.C. §§ 1713, 1715.

A magistrate, hearing the case, recommended to the district court that it grant the motions of HUD and Kenmore for summary judgment. The court adopted the magistrate's recommendations, 601 F.Supp. 38 (D.Mass.1984). The Bank appeals. We agree with the Bank that the award of summary judgment was legally improper; and, we remand the case for further proceedings.

1. Our basic task on this appeal is to decide whether the argument between the Bank and the defendants about the interpretation of the contract raises any "genuine issue as to any material fact." Fed.R. Civ.P. 56(c). We note that cases discussing 'interpretation' of a contract sometimes refer to such an issue as one of "law" and sometimes as one of "fact." *See, e.g., Ed-*

---

* Of the Fifth Circuit, sitting by designation.

*monds v. United States,* 642 F.2d 877, 881 (1st Cir.1981); *Gillentine v. McKeand,* 426 F.2d 717, 721 (1st Cir.1970); *Rizzo v. Cunningham,* 303 Mass. 16, 20 N.E.2d 471, 474 (1939). Thus we explain at the outset how we view the fact/law dichotomy in the context of this summary judgment appeal.

In our opinion, an argument between parties about the meaning of a contract is typically an argument about a "material fact," namely, the factual meaning of the contract. But, sometimes this type of argument raises "no genuine issue." The words of a contract may be so clear themselves that reasonable people could not differ over their meaning. Then, the judge must decide the issue himself, just as he decides any factual issue in respect to which reasonable people cannot differ. *See* 3 *Corbin on Contracts* § 554 (1960). Courts, noting that the judge, not the jury, decides such a threshold matter, have sometimes referred to this initial question of language ambiguity as a question of "law," which we see as another way of saying that there is no "genuine" factual issue left for a jury to decide. *See Edmonds v. United States, supra; Rizzo v. Cunningham, supra.* Even if there is ambiguity in the language, however, the evidence presented about the parties' intended meaning may be so one-sided that no reasonable person could decide the contrary. *See* 3 *Corbin on Contracts, supra.* In such a circumstance, the judge also would take the matter from the jury, deciding the factual question of meaning himself as (in the same sense) one of "law." Thus, our job here is to decide whether the evidence, viewed favorably to the Bank, *see Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976), so clearly supports HUD and Kenmore that no 'reasonable person' could differ about what the contract means, either because the language is unambiguous or the supporting evidence is sufficiently one-sided. If neither of these conditions is met, the case raises a "genuine issue" of fact; and the judgment must be reversed.

2. The Bank's major argument on this appeal concerns Clause 2, the 'change of use' provision. The Bank notes that Kenmore's conversion means that those who now rent apartments will buy (or have bought) shares in the new cooperative. The shares carry with them the effective right to permanent possession. Instead of paying rent as a tenant, the 'purchaser' will pay a significantly lower monthly maintenance fee. The Bank says that this change amounts to a "use" of the property for a "purpose other than the use" for which the "property was intended ... at the time the Mortgage was executed." (Clause 2.)

The language of Clause 2 is itself ambiguous. The property still will be used for residential purposes. In that sense there is no change in use. The property, however, no longer will be used for "rental apartments"; instead, it will be used for "cooperative" or "purchased" apartments. In that sense, there is a change of use. Thus, one must look to evidence other than the contractual words themselves to determine whether this clause was intended to apply to circumstances of the sort presented. *United Truck & Bus Service Co. v. Piggott,* 543 F.2d 949, 950 n. 1 (1st Cir.1976). *See* 3 *Corbin on Contracts* § 579 (1960).

The record contains considerable evidence supporting the Bank's interpretation. The Bank, for example, presents arguments with supporting affidavits, suggesting that the "change" is an important one, working to its disadvantage. It says that the 'resale' market for mortgages reacts negatively to this type of change in the character of an apartment house because those who own their apartments are less likely to retire the mortgage 'early' (before it is due) than is the owner of a building with rental apartments. The Bank adds that the change will make rent collection (in case of default) more difficult for there will no longer be rents to collect. The Bank also points to HUD manuals, studies, statements in depositions, and other related documents, all of which suggest that HUD, at various times and for various purposes, has referred to a change in the form of

ownership like the one here at issue as a "change" in the "use" of a building. All this evidence is relevant to the meaning of Clause 2, for it suggests custom or usage or reasons or motives that would support the Bank's interpretation.

HUD and Kenmore, on the other hand, point to court cases that define "change of use" to mean change from, for example, a "commercial" use to a "residential" use of property. These cases, however, are not strong enough to resolve the factual question, for they deal with the use of these words in zoning laws or regulations or in contracts that are only roughly similar to the contract here at issue. *See, e.g., Bronstein v. Prudential Ins. Co.,* 390 Mass. 701, 459 N.E.2d 772, 778 (1984); *Maplewood Village Tenants Association v. Maplewood Village,* 116 N.J.Super. 372, 282 A.2d 428 (1971). HUD and Kenmore also point to the fact that HUD has guaranteed the mortgage, as showing that the Bank did not need the security that its interpretation of Clause 2 offers. This fact, while evidentiary, does not conclusively prove that HUD is right, for the agreement contains other clauses that quite plainly offer the Bank security over and above HUD's guarantee. Given the considerable evidence supporting the Bank, the record does not permit the conclusion that the Bank's interpretation is clearly wrong.

The Bank apparently wishes us to go further and to hold, in light of the record, that its interpretation is clearly right, that no reasonable person could disagree. While the Bank's arguments are strong, we are not convinced, in light of the defendant's evidence and arguments, that it is entitled to summary judgment. Regardless, rather than our analyzing all the detailed evidence so far presented, the best course is for the district court to do so in light of the discussion contained in this opinion. *Cf. Kelley v. Southern Pacific Co.,* 419 U.S. 318, 331–32, 95 S.Ct. 472, 479–80, 42 L.Ed.2d 498 (1974). Moreover, the parties may wish to proceed to trial, introducing other evidence; regardless, they may supplement the current record with additional evidence showing what this language is customarily taken to mean. *See* 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure: Civil 2d,* § 2730.1 at 284 (2d ed. 1983) ("When evidence of the custom and usage of the trade is required in order to interpret an agreement, the Rule 56 motion will be denied.")

■ 3. HUD and Kenmore argue that we need not have investigated the meaning of Clause 2 (as we have just done) because the summary judgment can be upheld on the basis of a different, related section of the mortgage contract, namely, Clause 3. Clause 3 of the mortgage contract states that a separate

> Regulatory Agreement ... executed by the Mortgagor and [HUD] is incorporated herein and made a part of this Mortgage.

The separate Regulatory Agreement contains a Paragraph 6, which states in part

> Owners [i.e., the mortgagor] shall not without the prior written approval of [HUD] ... [p]ermit the use of the [property] ... for any purpose except the use which was originally intended or permit commercial use greater than that originally approved by [HUD]. ...

HUD and Kenmore argue that these two clauses, taken together, mean that HUD's approval of a 'change in use' *automatically* carries with it the Bank's approval or, at least, obviates the need for Bank approval. And, the magistrate agreed.

Nothing in the language of Paragraph 6, however, supports HUD's and Kenmore's interpretation. Paragraph 6 refers to HUD, not to the Bank. It says that HUD's approval is *necessary* for a 'change of use'; it does not say that HUD's approval is *sufficient.* The natural reading of Paragraph 6 of the Regulatory Agreement and Clause 2 of the contract is that, taken together, an owner must obtain the approval of *both* the Bank *and* HUD for a change of use; Clause 2 protects the Bank and Paragraph 6 protects HUD. To find an inconsistency between the two (as the appellees argue we must), one would have to

believe that Clause 2 prohibits the Bank from ever *allowing* a change in use. (Then, of course, Paragraph 6 would be meaningless, for there could never be a change.) But Clause 2 does not absolutely prevent a change; it does not forbid the *Bank* from allowing a change; it forbids the *owner* from changing; the Bank presumably can permit a 'change of use' simply by waiving Clause 2 in a particular instance or by agreeing not to enforce it. *See* 3A *Corbin on Contracts* § 752 (1960) (waiver); *cf.* 6 *Corbin on Contracts* § 1293 (1962) (substituted contract—novation).

HUD and Kenmore argue that, in any event, the purposes of the National Housing Act require the interpretation they offer of Paragraph 6, lest too much power to control a building's use pass to the Bank. They point to nothing in the Regulatory Agreement, the contract, or the Act, however, which forbids a bank and HUD each to maintain an independent veto over a change in use. Thus, the magistrate's award of summary judgment on the basis of Clause 3 and Paragraph 6 was improper. Since, however, we believe it inappropriate now to decide the issue whether the *Bank* should have been granted a 'partial summary judgment,' HUD and Kenmore remain free to press their arguments and to present additional evidence on the point in the district court.

■ 4. The district court should also reconsider the evidence and argument in respect to Clauses 12 and 4. The Bank makes two arguments in respect to Clause 12, which prohibits the creation of "inferior liens" against the mortgaged property. First, as we understand its argument, it says that the Clause prohibits Kenmore from allowing (or arranging for) apartment tenants to borrow money to buy the apartments while pledging as collateral the 'cooperative shares' that effectively give them the right to permanent possession of the apartment. Of course, the Bank does not claim that Clause 12 prohibits the apartment house owner from leasing apartments. Nor does it say that Clause 12 would prevent a tenant from pledging his

lease, were he an ordinary tenant for a limited term. But, the Bank seems to claim that "lessees" could not pledge their leases where the leases were *permanent,* and where the pledges of *all* leases would effectively amount to pledges ("inferior" pledges) of the building itself. And, it adds, the 'lessees,' who are then effectively owners, cannot accomplish the same result by pledging cooperative shares that give them rights equivalent to that of a permanent lease.

Second, the Bank argues that the mortgagor violated Clause 12 by allowing the apartment purchasers to pledge as security for their loans certain movable items, like refrigerators. The Bank says these particular items constituted part of the security subject to the Bank's mortgage. Thus, Kenmore has allowed (or arranged for) the creation of an "inferior lien." Finally, the Bank argues that Clause 4, by assigning the "rents" to the Bank, forbids the mortgagor from effectively eliminating all rents. It agrees that the mortgagor could raise or lower rents without its permission; but, it says, the mortgagor cannot severely impair its security by doing away with rents altogether.

HUD and Kenmore have answered each of these arguments at length, pointing to various features of the contract and the situation that, in their view, show the Bank's interpretations are wrong. Our review of the arguments, responses, and the evidence presented convinces us that the issues are serious and difficult. We cannot say that a court *must,* as a matter of law, find in favor of appellees, particularly in light of the possibility that a court's view of the contract, reached in light of evidence and argument in respect to Clause 2, could properly influence its interpretation of Clauses 12 and 4. The district court, therefore, should reconsider all the issues raised in this case in light of existing (and any newly presented) evidence.

5. Since this case may return on a future appeal, we wish to call the parties' attention now to a question that the Bank's statutory argument raises. The Bank ar-

gued below that Housing Act § 207, in light of § 213, 12 U.S.C. § 1715, forbids HUD to approve a conversion of rental apartments to a cooperative of the type before us. The magistrate rejected this claim on the authority of *Angleton v. Pierce*, 574 F.Supp. 719 (D.N.J.1983), *aff'd*, 734 F.2d 3 (3d Cir.), *cert. denied*, — U.S. ——, 105 S.Ct. 245, 83 L.Ed.2d 183 (1984), which made clear that § 207 gives HUD the authority to guarantee loans made to cooperative apartments, as well as to more typical rental apartment buildings. *Angleton* did not, however, focus on one important aspect of the Bank's argument.

Section 207 specifically requires HUD to regulate or to restrict the rents and profits of the borrower "to such extent and in such manner as to provide reasonable rentals to tenants and a reasonable return on the investment." 12 U.S.C. § 1713(b)(2). Such a restriction may amount to a form of rent control, holding the rent charged below the level that the market might otherwise dictate. Any such restriction would be meaningless, however, were the landlord free to convert the apartment house to a cooperative or condominium and to sell the apartments at a price equal to the capitalized value of expected future "market price" rents. Consider a hypothetical example. Suppose HUD required the owner of a building with 100 apartments to rent them for a "reasonable rent" of $300 each per month, yielding $360,000 in yearly revenue, when the market rate for such apartments was, say, $600 per month, which would yield $720,000 yearly revenue. Assume, too, that real estate taxes and expenses amount to $160,000 per year, leaving the owner, after charging the controlled $300 per month rent, with $200,000 profit on his investment. If such an owner can turn his building into a cooperative, he might sell each apartment for, say, $50,000 and invest the resulting $5,000,000 return in a way that yields him $400,000 or so of return instead of $200,000. Each tenant would have to pay interest on $50,000 and would have to pay a monthly maintenance fee as well—an amount that could come close to the $600 per month rent that HUD initially

(and hypothetically) would have believed unreasonably high.

*Angleton* did not consider the relevance of this argument to the question of whether the statute impliedly forbids this precise type of conversion from rental to cooperative apartments—at least, it did not consider the argument in sufficient detail for us now to be certain that its holding is dispositive. The fact that the statute allows HUD to lend money to a cooperative does not, by itself, dispose of the question whether, or when, the statute allows HUD to permit *conversion* from one form of ownership to the other. Nor does the fact that Congress left the amount of a "reasonable rent" up to HUD, *see Langevin v. Chenango Court, Inc.*, 447 F.2d 296 (2d Cir.1971); *Hahn v. Gottlieb*, 430 F.2d 1243 (1st Cir.1970), by itself necessarily mean that HUD is free to allow conversion while paying no attention at all to whether the conversion sales price is reasonable. Counsel for the government said at oral argument that "under § 207, HUD does not regulate resale of the building."

We do not now express any opinion about whether § 207 does or does not allow HUD to approve this type of conversion. And we recognize the possibility that, should the parties later argue this issue here, we might conclude that the question does not raise a significant legal issue. Nonetheless, it may help to simplify our later task to ask the parties to focus on this issue should they believe it likely to become relevant on a future appeal.

■ 6. Finally, we mention, again for future guidance (in cases other than this one) a recurring procedural difficulty that this case may illustrate. The case seems to be one that the parties wished a magistrate or judge (not a jury) to decide on the basis of a written record. They did not stipulate, however, that the magistrate should do so; they filed cross-motions for summary judgment instead. The (sometimes unrecognized) difference between these two procedures is important; to stipulate a record for decision allows the judge to decide any

significant issues of material fact that he discovers; to file cross-motions for summary judgment does *not* allow him to do so.

Consider the problem of the district court that receives cross-motions for summary judgment in such a case. It must examine what may be a lengthy record. If it finds any significant factual issues, it must then go back to the parties to see whether they wish it to decide that issue—a waste of time if they had wanted it to do so in the first place. Alternatively, the district court may grant summary judgment for, say, a defendant, but the *appellate* court may find a significant factual question. Where the procedure consists only of 'cross-motions for summary judgment,' and the appellate court finds that genuine issues of material fact exist, it must remand to the district court for factfinding. *See Wiley v. American Greetings Corp.*, 762 F.2d 139, 140–41 (1st Cir.1985); *New England Apple Council v. Donovan*, 725 F.2d 139, 141 n. 2 (1st Cir.1984); *Country Gas Services, Inc. v. United States*, 405 F.2d 147, 149 (1st Cir.1969) ("On appeal from a summary judgment, the only question is whether the allegations of the party against whom it was rendered were sufficient to raise a material or genuine issue of fact."). This remand might have been avoided had the parties initially authorized the district judge to *decide* any disputed factual question that he found. The appellate court would then have received the decision under a "clearly erroneous" factfinding standard, *see* Fed.R.Civ.P. 52(a).

All this may be obvious to the district judges and to many lawyers (quite possibly including counsel here). But we mention the matter because, given the pressure of a heavy case load and the consequent need for judicial efficiency, it may be desirable for district courts specifically to draw counsel's attention in an appropriate case to the limitations of the 'cross-motions for summary judgment' procedure.

In sum, we conclude that the grant of summary judgment was improper. On remand, the parties may submit additional evidence. The district court, in deciding

the case, should again consider all the issues and arguments in light of the record created.

For the reasons stated, the court's judgment is

*Vacated and the case is remanded for further proceedings consistent with this opinion.*