**ROBERTSHAW CONTROLS COMPANY, Plaintiff,**

v.

**WATTS REGULATOR COMPANY, George B. Horne, Timothy P. Horne, Defendants.**

Civ. No. 91–0382–P–C.

United States District Court, D. Maine.

Nov. 5, 1992.

David Peters, K. Sisk, Rita Sheffey, Hunton & Williams, Atlanta, GA, Joseph Groff, Jensen, Baird, Gardner & Henry, Portland, ME, for plaintiff.

Don Kennedy, John Daukas, Goodwin, Proctor & Hoar, Boston, MA, William Kayatta, Steven Abbott, Stephen Grygiel, Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Portland, ME, for defendants.

## MEMORANDUM OF DECISION AND ORDER

GENE CARTER, Chief Judge.

In this seven count action, Plaintiff seeks monetary damages from Defendant under

section 107 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9607, as amended by the Superfund Amendments and Reauthorization Act of 1986 ("CERCLA"), federal common law, and Massachusetts state law on strict liability, negligence, restitution, fraudulent misrepresentation, and wanton misconduct.[1] Plaintiff has filed a Motion for Partial Summary Judgment (Docket No. 9) as to the liability of Defendants under Section 107 of CERCLA. Defendants filed a Motion for Summary Judgment (Docket No. 15) on all counts of the Complaint, based upon a contractual release which Defendants argue bars all of Plaintiff's claims.

A motion for summary judgment must be granted if:

[T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). The Court of Appeals for the First Circuit has recently articulated the legal standard to be applied in deciding motions for summary judgment:

[T]he movant must adumbrate 'an absence of evidence to support the nonmoving party's case.' *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). When that is accomplished, the burden shifts to the opponent to establish the existence of a fact issue which is both 'material,' in that it might affect the outcome of the litigation, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976), and 'genuine,' in that a reasonable jury could, on the basis of

the proffered proof, return a verdict for the opponent. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *Oliver v. Digital Equipment Corp.*, 846 F.2d 103, 105 (1st Cir.1988). It is settled that the nonmovant may not rest upon mere allegations, but must adduce specific, provable facts demonstrating that there is a triable issue. 'The evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limits differing versions of the truth which a factfinder must resolve at an ensuing trial.' *Mack v. Great Atlantic and Pacific Tea Co.*, 871 F.2d 179, 181 (1st Cir.1989). As the Supreme Court has said:

[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

*Anderson*, 477 U.S. at 249–59, 106 S.Ct. at 2510–15.

*Brennan v. Hendrigan*, 888 F.2d 189, 191 (1st Cir.1989).

## FACTS

The Court finds the following undisputed facts. Plaintiff Robertshaw Controls Company ("Robertshaw") is a Delaware corporation with its principal place of business in Richmond, Virginia. Defendant Watts Regulator Company ("Watts Regulator") is a Massachusetts corporation with its principal place of business in North Andover, Massachusetts.[2] Individual Defendants George B. and Timothy P. Horne ("Individual Defendants") are citizens and residents of Massachusetts.

Today, Robertshaw owns a site ("the Site") located in Kittery, Maine where it conducts manufacturing operations.[3]

---

1. Plaintiff withdrew Count VII for fraudulent concealment in Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment (Docket No. 25).

2. Watts Regulator did business during that time as Watts Fluid Power Corp., Watts Regulator, and/or Watts Regulator (Fluid Power Division).

For simplicity, the Court will refer to Defendant only as "Watts Regulator."

3. Robertshaw is the successor, by merger, to the interests in the Site of Watts Fluidair Inc. (previously Watts Fluid Power, Inc.). In order to avoid confusion, this Court will only refer to Robertshaw, rather than referring to Robert-

From approximately 1967 until March 15, 1978, Defendant Watts Regulator owned the Site and conducted numerous manufacturing operations, from machining through final assembly and packaging, related to the production of compressed air regulators, filters, lubricators, and regulators at the Site. Many of these manufacturing operations involved the use of hazardous substances.

George and Timothy Horne were shareholders of Watts Regulator during the time that it owned and conducted business at the Site. From approximately 1967 through the period prior to and including the time of the sale of the Site in 1978, George Horne was an officer of Watts Regulator. He served as President from 1967 until September 1976. From September 1976 through the period prior to and at the time of the sale of the Site, George Horne was Chairman and Chief Executive Officer of Watts Regulator.

In his capacity as Chairman and Chief Executive Officer, George Horne had the authority to control the use and disposal of waste and hazardous materials at the Facility; he managed Watts Regulator's growth and new product development, including the areas of sales, marketing and manufacturing; and he provided the necessary ultimate approval of purchase orders for capital expenditures for the Facility, inducing capital expenditures for the initial machines and equipment as well as those related to recommendations for improvements in processes or equipment used at the facility. Over the years, George Horne visited the Site when it was being prepared for construction, to review the progress of any construction, to meet with employees, and to tour the manufacturing operations with guests. Because he had responsibilities for the corporate affairs of Watts Regulator, George Horne was also involved in negotiating the sale of the Site to Robertshaw.

Similarly, Timothy Horne was also an officer of Watts Regulator from 1967 to through the time of the sale of the Site in 1978. Timothy Horne had the authority the control the use and disposal of waste and hazardous materials at the Facility; he provided approval of capital and noncapital expenditures for the Facility, including expansion of the Facility; he had responsibility concerning the use of machinery; he initiated and participated in the decision-making process with respect to the selection, replacement and rearrangement of equipment at the Facility; and he made organizational and personnel decisions with respect to Watts Regulator's employees working at the Facility.

Pursuant to an agreement dated December 23, 1977, a British firm known as CompAir Limited and its wholly owned subsidiary, Robertshaw, purchased the Watts Regulator assets, including the Site, from Watts Regulator. At the time of the sale of the Site, George and Timothy Horne were shareholders of Watts Regulator. As part of the sale of the Site, George and Timothy Horne were holders of title to the Site for one day, until the title passed to CompAir Limited and Robertshaw.[4]

After purchasing the Site, Robertshaw eliminated the process discharges involved in the machinery operations and sealed all drains allowing untreated waste to be discharged into the soil in 1979 and 1980.[5] Business disputes later arose between Watts Regulator, Robertshaw, Robertshaw's corporate parent, CompAir Inc., and CompAir Limited.[6] On February 11, 1982,

---

shaw's predecessors throughout the opinion by name. Because Robertshaw's claims flow from its successor status, making the differentiation between Robertshaw and its predecessors is unnecessary for the purpose of this Court's present analysis.

4. George and Timothy Horne personally held the title to the Site from March 15, 1978 until March 16, 1978.

5. The parties dispute whether Robertshaw knew, in 1979–1980, that the Site was contaminated by hazardous substances.

6. The parties disagree as to whether these disputes *only* concerned the pricing of certain products manufactured by Robertshaw to Watts Regulator and the valuation of certain machinery transferred to what is now Robertshaw from another Watts facility after execution of the 1977 sale agreement.

the parties executed a Settlement Agreement and a Release to resolve these disputes.[7]

In October 1987, Robertshaw was required by the Maine Department of Environmental Protection ("DEP") to submit a preliminary site assessment report for the area. The preliminary report submitted to the DEP in December 1988, stated that the soils, sediments and groundwater at the Site were contaminated with hazardous substances.[8] In December 1989, Robertshaw submitted a Site Assessment Report to the DEP, documenting the extent to which the soils, sediments, and groundwater at the Site were contaminated with hazardous substances.

In March 1990, the DEP issued, and Robertshaw agreed to comply with, an Administrative Consent Agreement and Enforcement Order. The requirements of the Order include the submission of a plan providing for removal or treatment of all hazardous substances at the Site. To date, Robertshaw, under the terms of the Order,

has paid more than $1.3 million for investigation, testing, monitoring, sampling, analysis, evaluation, oversight, and internal remediation on the Site. In addition, Robertshaw has expended over $160,000 in attorneys' fees in response to the release or threatened release of numerous hazardous substances at the Site. The remediation continues and Plaintiff's estimated total cost, subject to modification, is $3.7 million.

## I.  LIABILITY UNDER CERCLA

█ The Court has carefully examined the record of this case and has found genuine issues of material fact to be in dispute regarding whether each of the various chemicals found in the soil was released during Defendants' ownership of the Site. Of the nine chemicals found in the soil by the DEP and for which Plaintiffs seek removal costs, the parties only agree about the release of one chemical during Defendants' ownership of the Site.[9] Whether or

---

7. The Settlement Agreement states in part:

   As settlement in full for the net underpayment, interest and any and all costs and expenses relating thereto, [Watts Regulator] will make a lump-sum payment of $277,500 to [Robertshaw] on the condition that Compair, Compair, Inc. and [Robertshaw] execute a release substantially in the form attached thereto.

   The Release provides:

   In consideration of the sum of $277,500 paid by Watts Regulator Co., a Massachusetts corporation, to [Robertshaw], a Delaware corporation, and other good and valuable consideration the receipt of which is hereby acknowledged, [Robertshaw], CompAir Limited, a United Kingdom corporation, and CompAir Inc., a Delaware corporation, their successors and assigns, release and forever discharge [Watts Regulator], its stockholders, officers, and directors, in such capacities and individually from all debts, demands, actions, causes of action, suits, accounts, contracts, agreements, damages, and any and all claims, demands and liabilities whatsoever, which against [Watts Regulator], or its successors and assigns, or against its stockholders, officers and directors, in such capacities and/or individually, CompAir Limited, CompAir, Inc. or Watts Fluidair, Inc. or their respective successors and assigns *ever had, now have or may have arising out of events prior to the date hereof, and relating in any way to (a) the agreement dated December 23, 1977 among George B. Horne, Timothy P. Horne, Frederic*

   *B. Horne, Peter W. Horne, Deborah Horne and Daniel W. Horne (hereinafter "Selling Shareholders"), CompAir Limited and [Robertshaw], (b) the Service Agreement dated as of December 14, 1977 between [Watts Regulator] and [Robertshaw] and (c) the Employment Agreement dated as of December 14, 1977, as amended, between [Robertshaw] and Timothy P. Horne, and claims relating to any and all purchases and sales made between [Watts Regulator] and [Robertshaw],* provided that nothing herein shall release [Watts Regulator] or the Selling Shareholders from claims relating to the Patent and Trademark Agreement dated as of December 23, 1977 among the Selling Shareholders and [Watts Regulator] and the related assignment of rights thereunder by the Shareholders to [Robertshaw] or, in the case of Timothy P. Horne, Section 5 of his Employment Agreement, as amended, with [Robertshaw].

   This release may not be changed orally.

   *Release,* Affidavit of Timothy P. Horne (Docket No. 18), Attachment C (emphasis added).

8. The contaminating substances included: trichloroethylene, 1,1,1–trichloroethane, lead, chromium, zinc, perchloroethylene, ethyl ketone (MEK), methyl isobutyl ketone (MIBK), and butyl acetate.

9. The following is an excerpt from Plaintiff's Statement of Material Facts regarding the spilling of chromium. Defendants did not dispute any portion of these facts, thus they are taken as

not the other eight chemicals were released onto the Site during Defendants' tenure, and if so, in what proportion, is relevant to the proper apportionment of removal costs among the parties. Thus, a genuine issue of material fact remains in dispute making a full determination of CERCLA liability a question for the factfinder.

However, in spite of these genuine issues of material fact, the Court must determine whether the Individual Defendants are proper defendants in this case, as corporate officers held personally liable under CERCLA. CERCLA was enacted in response to the increasing concern about the vast problems of the disposal of and contamination from hazardous waste throughout the country. It is a remedial statute designed to protect and preserve public health. *See U.S. v. Kayser–Roth Corp.*, 910 F.2d 24, 26 (1st Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 957, 112 L.Ed.2d 1045 (1991). Section 107(a) of CERCLA imposes liability on the following classes of persons:

(1) the owner and operator of a vessel (otherwise subject to the jurisdiction of the United States) or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance.

42 U.S.C. Section 9607(a).

Plaintiff asserts that George and Timothy Horne are liable under § 9607(a)(2) as "owners" and "operators" of the facility when hazardous substances were leaked. Plaintiff first argues that when George and Timothy Horne held title to the Site from March 15–March 16, 1982, they were owners of the Site for purposes of CERCLA liability. Additionally, Plaintiff argues that the Individual Defendants were operators of the Facility by virtue of their management responsibilities from 1967–1978 and, thus, are similarly liable under CERCLA for any releases that occurred during that time.

### A. OWNER LIABILITY

■ CERCLA does not state the limits on ownership liability; thus, the courts have attempted to fashion such parameters with the aid of the Congressional record and explicit legislative intent. Courts have held that ownership liability does not hinge on shareholder status. As the Fifth Circuit explained, "the property of the corporation is its property, and not that of the stockholders, as owners." *Riverside Market Development Corp. v. International Building Products, Inc.*, 931 F.2d 327, 330

true for purposes of summary judgment. *See* Local Rule 19(c); *McDermott v. Lehman*, 594 F.Supp. 1315, 1321 (D.Me.1984).

Beginning in approximately 1970 and up through the period prior to the sale of the Site in March 1978, a "bright dipping" process was used at the Facility. Scarponi Aff. ¶ 11. This process used two tanks, one holding a chromatic acid solution (Purple Dep. Tr. at 51) and the other holding rinse water. To prevent the rinse water from becoming concentrated with the chromatic acid solution, an overflow replacement rinse system was used ... in which water was added on a continuous basis to the rinse tank to produce an overflow. Purple Dep. Tr. at 54–55.... All the overflow rinse water from the bright dipping operations passed through this drain, untreated. Purple Dep. Tr. at 55; Scarponi Aff. ¶ 11. This drain lead to a system of floor drain pipes, which lead to an outside catch basin emptying into ditch on the Site. Hall Dep. Tr. at 35–37, 50.

During normal bright dipping operations, solution would drip to the floor as the product was moved from one tank to another. Purple Dep. Tr. at 51–52. Following the bright dip immersion, rinse water was discharged to a floor drain (Defendants' Interrogatory Response No. 1) leading directly to the soil, sediments, and groundwater at the Site. Answer ¶ 20; Scarponi Aff. ¶ 11.

(5th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 636, 116 L.Ed.2d 654 (1991) (quoting 1 C. Keating & G. O'Gradney, *Fletcher Cyclopedia of the Law of Private Corporations* § 31 at 555 (1990)). Thus, the Individual Defendants' shareholder status alone is not enough to make them owners for liability purposes under CERCLA.

Plaintiffs, however, assert that George and Timothy Horne are owners as contemplated under CERCLA because they held title to the Site for a twenty-four hour period during the process of the sale from Watts Regulator to CompAir Limited and Robertshaw. This Court is unwilling to hold the Individual Defendants liable under CERCLA as owners for the spillage of hazardous substances over a period of years based on a twenty-four hour period of vested title.

In *In re Diamond Reo Trucks, Inc. v. the City of Lansing, et al.,* 115 Bankr. 559 (W.D.Mich.1990), the court faced a factually similar situation. In that case, the City of Lansing moved for summary judgment on its cross-claims against its co-defendants under the liability provisions of CERCLA. The court examined whether the co-defendants were appropriate "responsible parties" under Section 9607(a). *Id.* at 568. One co-defendant, E.I.C., acquired the land at issue and transferred it on the same day, and was not a party to the leasing agreement with the Debtor.[10] *Id.* Labeling E.I.C. a "'straw' or conduit through which ownership of the site passed" because the land was acquired and transferred within the same day, the Bankruptcy Court found that "it would be tenuous to hold such a constructive owner liable for purposes of Section 9607(a) ... as such a holding would be extending the statutory language to an absurd plateau, thereby perverting congressional intent." *Id.*

This Court agrees with the Bankruptcy Court's reasoning in *In Re Diamond* and finds it applicable in the instant case. The

Individual Defendants here likewise served in the role of a "conduit" for the title, as it passed from Watts Regulator to CompAir Limited and Robertshaw. To impose owner liability under Section 9607(a) on the basis of one twenty-four hour period of title possession during a two-step sales transaction seems beyond the bounds of congressional intent. This Court declines to do so, holding, as a matter of law, that the Individual Defendants do not constitute "owners" for liability purposes under CERCLA on the record here made.

## B. OPERATOR LIABILITY

██ Under traditional corporate law, corporate officers are protected from personal liability for the acts of the corporation by the corporate shield. However, CERCLA allows corporate officers to be held personally liable if they constitute operators under the statute. *See* 42 U.S.C.A. § 9607(a). "This personal liability is distinct from the derivative liability that results from 'piercing the corporate veil' where we would hold the owners of a less than bona fide corporation responsible for corporate acts." *Riverside,* 931 F.2d at 330 (quoting *United States v. Northeastern Pharmaceutical & Chemical Co.,* 810 F.2d 726, 744 (8th Cir. 1986), *cert. denied,* 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987)).[11]

Courts have struggled with the appropriate standard to apply in determining "operator" liability under CERCLA. Some courts apply a standard that hinges on whether the person in question had the authority to control the handling of the substances. *New York v. Shore Realty Corp.,* 759 F.2d 1032, 1052 (2d Cir.1985) (the definitional language of § 9601(20)(A) implies that an owning stockholder who manages the corporation is liable under CERCLA as an "owner or operator"); *United States v. Northeastern Pharmaceutical & Chemical Co.,* 810 F.2d 726, 743 (8th Cir.1986), *cert. denied,* 484 U.S. 848,

---

**10.** Later, E.I.C. again acquired the site, this time for a period of three months. The court analyzed separately the impact of each possession.

**11.** *But see Joslyn Corp. v. T.L. James & Co.,* 696 F.Supp. 222, 226 (W.D.La.1988) (holding that

neither the clear language of CERCLA nor its legislative history provides authority for disregarding the corporate form or imposing individual liability on corporate officers).

108 S.Ct. 146, 98 L.Ed.2d 102 (1987) ("it is the authority to control the handling and disposal of hazardous substances that is critical under the statutory scheme"); *Kelley v. Thomas Solvent Co.*, 727 F.Supp. 1554, 1561–1562 (W.D.Mich.1989). More recently, some courts have asked whether the person in question had actual control over or actually participated in the operation of the facility. *Levin Metals Corp. v. Parr–Richmond Terminal Co.*, 781 F.Supp. 1454, 1457 (N.D.Cal.1991); *Riverside Market Development Corp. v. International Building Products, Inc.*, 931 F.2d 327, 330 (5th Cir.1991); *Rockwell International Corp. v. IU International Corp.*, 702 F.Supp. 1384, 1390 (N.D.Ill. 1988).

Neither the Court of Appeals for the First Circuit nor the district courts in this Circuit have directly addressed the issue of operator liability of a corporate officer under CERCLA.[12] Other circuit and district courts have, however, and their opinions are instructive. This Court will examine two cases which point out most clearly the conflicting tests on this issue: *Kelley v. Thomas Solvent Co.*, 727 F.Supp. 1554, (W.D.Mich.1989); and *Levin Metals Corp. v. Parr–Richmond Terminal Company*, 781 F.Supp. 1454 (N.D.Cal.1991).

In *Kelley*, the court urged a case-by-case analysis of the facts at hand, with an eye toward "evidence of an individual's authority to control, among other things, waste handling practices." *Id.* at 1562. The Court suggested an examination of: whether the individual holds the position of officer or director, especially where there is a co-existing management position; distribution of power within the corporation, including position in the corporate hierarchy and percentage of shares owned; evidence of responsibility undertaken for waste disposal practices, including evidence of responsibility undertaken and neglected; and, affirmative attempts to prevent unlawful hazardous waste disposal. *Id.* The Court specifically tried to fashion a standard unlike the lack of corporate formalities associated with piercing the corporate veil, and different from the issue of personal knowledge, direct supervision, or active participation found in ordinary torts by corporate actors. *Id.* Thus, "the focus of the inquiry is whether the corporate individual *could have prevented* the hazardous waste discharge at issue." *Id.* This standard is sometimes referred to as "the prevention test."

*Levin Metals*, on the other hand, focuses its inquiry on whether or not the corporate officer *actually participated* in the operation of the facility at which the hazardous substances are disposed of, exercises control over the company immediately responsible for the operation of that facility, or is otherwise intimately involved in that company's operations. *Levin Metals*, 781 F.Supp. at 1457. The court in *Levin Metals* surveys the legal landscape on this issue and concludes that most cases imposing liability have effectively made findings both of actual participation in the operations of the facility and the exercise of control over the immediately responsible company. *Id.* Refusing to impose individual liability under the prevention test, the district court stated, "[Defendant] has offered no persuasive justification for adopting a (minority) standard which would come precipitously close to imposing personal liability upon the non-owner of property merely on the basis that the individual had knowledge of the operations of the disposal facility." *Id.* The court explained that it found such a standard "incongruent with at least the spirit, if not the holding" of *In Re Bergsoe Metal Corp*, 910 F.2d 668 (9th Cir.1990) in which the Ninth Circuit Court of Appeals held that a secured creditor must exercise management authority before it can be held liable for action or inaction which results in the discharge of hazardous wastes. *Id.*

In the most recent opinion by a federal appellate court on this issue, the Fifth Circuit Court of Appeals, in *Riverside Market Development Corp. v. International Building Products, Inc.*, 931 F.2d 327, 330

---

12. *See United States v. Kayser–Roth Corp.*, 910 F.Supp. 24 (1st Cir.1990) (parent corporation could be held liable as "operator" of subsidiary under CERCLA if parent corporation was actively involved in the subsidiary's activities).

(5th Cir.1991), adopted the *Levin Metals* test and affirmed summary judgment for the defendant, holding that an officer and former majority shareholder of an asbestos-manufacturing company was not an "operator" under CERCLA and could not be held personally liable for cleanup costs. The court specifically examined evidence regarding the officer's professional duties, how much time the officer spent at the plant, and whether or not the officer had the opportunity to direct or personally participate in the improper disposal of asbestos. *Id.* The Fifth Circuit found that the plaintiffs failed to come forward with any evidence showing that the defendant personally participated in any conduct that violated CERCLA.[13] *Id.* Thus, the individual defendant was held not personally liable as a matter of law.[14] *Id.*

Despite this recent trend requiring a corporate officer to actually participate in illegal conduct under CERCLA before individual liability is imposed, this Court is inclined to adopt the prevention test laid out in *Kelley v. Thomas Solvent*, largely because of the strict liability standards incorporated into CERCLA itself. Although an explicit provision for strict liability was not included in the version of CERCLA that was adopted, Congress intended that re-

sponsible parties be held strictly liable. *Shore Realty Corp.*, 759 F.2d at 1042. Section 9601(32) provides that liability under CERCLA "shall be construed to be the standard of liability" under section 311 of the Clean Water Act, 33 U.S.C. § 1321, which courts have held to be strict liability, *see, e.g., Steuart Transp. Co. v. Allied Towing Corp.*, 596 F.2d 609, 613 (4th Cir. 1979), and which Congress understood to impose such liability. *See* 126 Cong.Rec. S 14964 (November 24, 1980). Congress specifically rejected including a causation requirement in Section 9607(a). *See Shore Realty Corp.*, 759 F.2d at 1044.

This Court is of the opinion that to compel an element of actual personal participation or involvement in hazardous waste disposal before imposing liability on corporate officers is to ignore the will of Congress regarding strict liability, thereby violating congressional intent and the separation of powers. Therefore, this Court adopts the prevention test for determining whether or not a corporate officer may be held personally liable as an operator under CERCLA. The factfinder in this case will need to resolve genuine issues of material fact, based on the evidence adduced at trial as to whether George and/or Timothy Horne could have prevented the hazardous

---

**13.** The court in *Riverside* explained:

The record clearly indicates that [Defendant] spent very little time at the asbestos plant, and no evidence has been presented to indicate that such visits would have provided [Defendant] with the opportunity to direct or personally participate in the improper disposal of asbestos or asbestos by-products. [Defendant] lived in New York and only visited New Orleans two to four times a year; and his participation in plant operations were limited to reviewing financial statements and attending meetings of the officers where he consulted with von Dohlen and others. On such sparse evidence, we find that the district court committed no error in granting summary judgment in favor of [Defendant]. *Riverside Market Development Corp. v. International Building Products Inc.*, 931 F.2d 327, 330 (5th Cir.1991).

**14.** Although no district courts in the First Circuit have fully examined the issue of operator liability of a corporate officer under CERCLA, there have been some nibbles around the edges of this issue. The closest any court in this Circuit has come to directly addressing this

question is a New Hampshire case, *Conductron Corporation v. Williams*, 785 F.Supp. 271 (D.N.H.1991) (per Stahl, D.J.). The court in *Conductron* denied the individual Defendant's motion for summary judgment on the issue of a corporate officer's personal liability under CERCLA due to disputed facts. Although the Court did not attempt a full-blown legal analysis of the issue, it did lay out its general supposition for such an analysis:

Courts have held uniformly that corporate officers who assert managerial responsibility and control over the disposal of hazardous waste are within the purview of § 9607(a)(2) as operators.

*Id.* at 274. It appears from the language used by the court, and the cases cited therein, that this court was leaning towards applying the *Kelley* prevention test. *See also, Cash Energy, Inc. v. Weiner*, 768 F.Supp. 892, 895–896 (D.Mass.1991) (per Keeton, D.J.) (the court did not reach the issue of the nature and degree of "control" essential to a claim against a corporate officer individually under CERCLA, although it did lay out the two conflicting standards).

waste discharge at issue and, hence, as to whether either or both may be held individually liable under CERCLA as operators of Watts Regulator for any contamination that may have occurred during their tenure at the company.

## II. CONTRACTUAL RELEASE

Defendants argue that they are improperly before the Court on this matter because a contract executed between the parties on February 11, 1982 "released" them from any and all claims arising out of events prior to that date. Plaintiffs respond that environmental claims are not specifically covered by the conditions of the release.

■ The settlement agreement provides that the settlement agreement and the release "shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts." A federal court sitting in a diversity action must apply the choice-of-law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). Maine courts honor contractual law selection. *Hanlin Group, Inc. v. International Minerals & Chemical Corp.*, 759 F.Supp. 925, 929 n. 3 (D.Me. 1990).

### A. FEDERAL OR STATE LAW

■ When deciding whether an agreement affects CERCLA liabilities, the courts, viewing the matter as one of contracts interpretation, have almost universally applied state law, to the extent that such law was not hostile to the federal interests embodied in CERCLA. *See Mardan Corp. v. C.G.C. Music, Ltd.*, 804 F.2d 1454, 1460 (9th Cir.1986) ("state law should provide the general content of federal law on the validity of releases of claims for cost-recovery under CERCLA"). Only two cases have applied the federal rule of decision that an agreement will be found to shift CERCLA liability solely if its terms so expressly provide. *See Mobay Corp. v. Allied–Signal, Inc.*, 761 F.Supp. 345, 357–358 (D.N.J.1991); *Wiegmann & Rose Int'l Corp. v. NL Industries*, 735 F.Supp. 957,

961–962 (N.D.Cal.1990). Because this Court views the interpretation of the release as one of contracts, the law of Massachusetts will be applied to determine the scope of the contractual release at issue, as it relates to CERCLA claims, except where Massachusetts contract law conflicts with federal goals in this arena.

### B. RELEASE APPLICATION TO CERCLA CLAIMS GENERALLY

■ This Court must first address whether it is permissible under CERCLA for a release *of any sort* to apply to CERCLA claims. Faced with this question, most courts have turned to the language of the statute and determined that CERCLA itself permits parties to allocate response-cost liabilities between them. Section 107(e)(1) of CERCLA states:

No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any ... facility or from any person who may be liable for a release or threat of release under this section to any other person the liability imposed under this section. Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section.

Thus, while a responsible party cannot avoid liability by such an agreement, it can determine who will bear the ultimate obligation to pay. *Mardan Corp.*, 804 F.2d at 1458; *Waterville Industries, Inc. v. First Hartford Corp.*, 124 Bankr. 411 (D.Me. 1991) (holding that a release of real estate-related causes of action was broad enough to preclude recovery for environmental costs associated with the property); *Rodenbeck v. Marathon Petroleum Co.*, 742 F.Supp. 1448, 1457 (N.D.Ind.1990) (holding that a clause releasing defendant "from all claims and obligations of any character or nature whatsoever arising out of or in connection with said agreements" clearly released defendant from future arising actions of any sort, including CERCLA claims). It is, thus, clearly permissible, on

statutory grounds, for a release to apply to CERCLA claims.

## C. LANGUAGE AND CONSTRUCTION OF THIS RELEASE

The Court must next determine whether the language of the release at issue applies, by its terms, to the CERCLA claims. The seminal Massachusetts case on releases, *Dunbar v. Dunbar*, 71 Mass. 103, 104–105 (1855), encourages "great liberality" in construing releases and urges interpreting the language of the release in conjunction with the intention of the parties. Further, the court instructs that, if general words are used and not later limited, those words must be construed broadly against the releasor. *Id.*

This Court has simplified the release at issue (by excision of superfluous language), for the purposes of analysis, to read as follows:

> In consideration of the sum of $277,500 paid by Watts Regulator Co., ... to [Robertshaw], a Delaware corporation, and other good and valuable consideration, ... [Robertshaw], ..., their successors and assigns, release and forever discharge Watts Regulator Co., ... from ... any and all claims ... against Watts Regulator Co., ... [Robertshaw], ... ever had, now have or may have arising out of events prior to [February 11, 1982] *and* relating in any way to (a) the agreement dated December 23, 1977 ..., (b) the Service Agreement dated as of December 14, 1977 ... *and* (c) the Employment Agreement dated December 14, 1977 ... *and* claims relating to any and all purchases and sales made between Watts Regulator Co. and [Robertshaw] provided that nothing herein shall release Watts Regulator Co. or the Selling Shareholders from claims relating to the Patent and Trademark Agreement dated as of December 23, 1977 among the Selling Shareholders and Watts Regulator

Co. and the related assignment of rights thereunder by the Shareholders to Watts Fluid Power, Inc. or, in the case of Timothy P. Horne, Section —— of his Employment Agreement, as amended with Watts Fluid Power, Inc.

(emphasis added). Defendants have argued that, under *Dunbar*, the release in this instant case constitutes a general release, releasing Defendants from any and all claims arising out of events prior to February 11, 1982.

This Court disagrees with Defendants' application of *Dunbar* in the case at bar. Unlike the release at issue in *Dunbar*, this release does not use broad general language without limitations. Rather, it begins with broad language ("release and forever discharge Watts Regulator, its stockholders, officers, and directors, in such capacities and individually from all debts, demands, actions, causes of action, suits, accounts, contracts, agreements, damages and any and all claims, demands and liabilities whatsoever ..."), followed by numerous specific limitations ("arising out of events prior to [February 11, 1982], *and* relating in anyway to" [each of three documents] "*and* claims relating to any and all purchases and sales made between Watts Regulator and [Robertshaw]").

This Court finds, as a matter of law, that the release at issue, given the specifications following the general language, is not a general release that releases Defendants from any and all claims against them, whether foreseeable or not. Yet, despite its specificity, or perhaps because of it, the intent of this release is quite ambiguous.[15] It is the use of the conjunctive word "and" to join the agreements enumerated as subject matter for which claims will be considered released that makes this contract language unclear. It is unclear whether the parties intended to release only claims that related to *each*

---

**15.** Under Massachusetts law, the determination of whether a contract is in fact ambiguous is a question of law for the Court. *Boston Helicopter Charter, Inc. v. Agusta Aviation Corp.*, 767 F.Supp. 363, 370 (D.Mass.1991). Generally, Massachusetts law construes ambiguous contract language against the drafter. *LFC Lessors,*

*Inc. v. Pacific Sewer Maintenance Corp.*, 739 F.2d 4, 7–8 (1st Cir.1984); *ER Holdings, Inc. v. Norton Co.*, 735 F.Supp. 1094, 1100 (D.Mass. 1990). However, because the parties dispute who prepared the initial draft of the release, the Court does not construe the language against either party for purposes of present analysis.

of the agreements listed, or, to release claims that related to *any* of the agreements listed.

Further confusing the analysis on this issue is some of the law regarding the use of the word "and" in a contract. In *Noell v. American Design, Inc. Profit Sharing Plan,* 764 F.2d 827, 833 (11th Cir.1985), the Eleventh Circuit Court of Appeals (quoting *Dumont v. United States,* 98 U.S. (8 Otto) 142, 143, 25 L.Ed. 65 (1878)) wrote, "It is an established principal that the word 'or' is frequently construed to mean 'and' and vice versa, in order to carry out the evident intent of the parties." The Court elaborated, explaining that this rule is particularly applicable "if the remainder of the agreement shows that a reasonable person in the position of the parties would so understand it." *Id.* (quoting 4 S. Williston, W. Jaeger, *A treatise on the Law of Contracts,* § 619 at 738 (1961)).[16]

 Thus, the intent of the parties is the focus of this Court's inquiry. If language in a contract is ambiguous, evidence may be admitted as to the intent of the parties, and the determination of the parties' intent is a question of fact. 17A Am. Jur.2d *Contracts* § 339 (1991); *Nevets C.M., Inc. v. Nissho Iwai American Corp.,* 726 F.Supp. 525, 531 (D.N.J.1989), *aff'd without op.,* 899 F.2d 1218 (3rd Cir.1990); *Acree v. Minolta Corp.,* 748 F.2d 1382, 1387 (10th Cir.1984).

A 1985 case of the Court of Appeals for the First Circuit directly addresses the general contract question of when, despite ambiguity in a contract, the parties' intent may be decided as a matter of law. *Boston Five Cents Sav. Bank v. Secretary of Dept. of Housing & Urban Dev.,* 768 F.2d 5 (1st Cir.1985). In *Boston Five Cents,* the Court noted that "an argument between parties about the meaning of a contract is typically an argument about a 'material fact,' namely the factual meaning of the contract." *Id.* at 8. Yet, the Court recognized that such a dispute did not necessarily raise a "genuine issue", for example, if the evidence presented about the parties'

intended meaning is so one-sided that no reasonable person could decide the contrary. *Id.* In such a case, the Court may decide the factual question of meaning itself as a matter of law. *Id.* Thus, the task facing this Court is to decide whether the evidence viewed favorably to Plaintiffs so clearly supports the Defendants that "no reasonable person" could differ about what the release means, either because the language is unambiguous or the supporting evidence is sufficiently one-sided. If neither of these conditions is met, the case raises a "genuine issue of material fact." *Id.*

This Court is unable to rule definitively on the meaning of the release in this matter, given the record furnished to the Court. The literal interpretation of the language in the release alone (e.g. "and" means "in addition to" *not* "or") results in a *very* restrictive release. Although the parties submitted some evidence regarding the disputes precipitating the drafting of the settlement agreement and the release, facts regarding these disputes, and the scope of the release, are in dispute. Further, little relevant evidence on how the word "and" was used and meant to be interpreted was submitted to the Court. For this reason, this Court will deny Defendants' Motion for Summary Judgment based upon the language of the release. The intent of the parties in this instance is a question of fact which must be decided by a factfinder at trial.

Accordingly, it is ORDERED that Plaintiff's Motion for Partial Summary Judgment on the Issue of CERCLA liability be, and is hereby, DENIED. It is further ORDERED that Defendants' Motion for Summary Judgment based on the contractual release between the parties be, and is hereby, DENIED.

So ORDERED.

**16.** *See also State Mut. Life Assur. Co. v. Heine,* 49 F.Supp. 786, 788 (W.D.Ky.1943) *aff'd,* 141 F.2d 741 (6th Cir.1944) ("[C]ases show that the word 'and' or 'or' will not be given its literal meaning when such meaning would do violence to the evident intent and purpose of the contracting parties, and the other meaning would give effect of such intent.").