**MINNESOTA POWER, Appellee,**

v.

**ARMCO, INC., Appellant.**

**No. 90–5404.**

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 14, 1991.

Decided July 9, 1991.

Kevin P. Hughes, New York City, for appellant. Dianne Rella also appeared on the brief.

Samuel L. Hanson, Minneapolis, Minn., for appellee. Gregory J. Stenmore and Kathleen Erickson, Minneapolis, Minn., and Thomas A. Micheletti and Douglas W. Peterson, Duluth, Minn., also appeared on the brief.

Before LAY, Chief Judge, FAGG and BOWMAN, Circuit Judges.

LAY, Chief Judge.

In 1978, Minnesota Power entered into two Electric Service Agreements with Reserve Mining Company ("Reserve"), a Minnesota corporation, to supply electricity to Reserve's taconite facilities in Babbitt and Silver Bay, Minnesota. At the time Reserve entered into the contracts it was owned equally by Armco, Inc. and Republic Steel Corporation ("Republic"). In 1982, Armco and Republic restructured Reserve into a partnership. Armco formed First Taconite in 1979, as a subsidiary corporation, to hold its partnership interest in Reserve. Prior to its bankruptcy in 1986, Reserve attempted to cancel its contract with Minnesota Power by sending cancellation notices effective November 9, 1990, for the Babbitt contract and June 1, 1991, for the Silver Bay contract. The total unpaid charges plus interest due under the agreements through March 1990, plus the present value of Reserve's future obligation, was $19,830,422.01. Minnesota Power brought suit against Armco for breach of contract asserting that Reserve was the alter ego of Armco. Minnesota Power also claimed First Taconite was the alter ego of Armco, thus making Armco a partner in Reserve. The district court[1] made findings of fact and conclusions of law and found that (1) from 1978 through 1982, Reserve was the alter ego of Armco and Armco was therefore bound to perform the agreements; (2) from 1982 through 1986, First Taconite was the alter ego of Armco and Armco was therefore a partner in Reserve and was bound to perform the agreements. The district court held that Armco was liable to Minnesota Power for breach of contract and entered judgment in the amount of $19,915,211.00 with postjudgment interest.

On appeal, Armco argues the district court erred by (1) failing to apply Minnesota law regarding the "consensual creditor rule"; (2) imposing an affirmative duty of disclosure on Armco contrary to Minnesota law; and (3) making certain factual findings relating to the alleged misrepresentation of the restructuring of Reserve. We affirm.

---

1. The Honorable Robert G. Renner, United States District Judge for the District of Minnesota.

## BACKGROUND

In 1976, Reserve was owned equally by Armco and Republic.[2] Reserve was classified as a "cost company" for income tax purposes and operated for the ultimate benefit of Armco and Republic. A cost company was treated essentially like a partnership and Armco and Republic possessed all of Reserve's economic interests and gains from its resources. Reserve's entire production was sold to Armco and Republic at cost. They also paid all of Reserve's capital costs and advanced all of its cash requirements. Effective July 1, 1977, the Internal Revenue Service revoked its ruling allowing cost companies and after a grace period taxed them as ordinary corporations. Reserve's cost company status was terminated effective August 1, 1979.

In 1979, Armco created First Taconite as a wholly owned subsidiary to hold its share of Reserve. Republic–Reserve, Inc., a wholly owned subsidiary of Republic, and First Taconite entered into a partnership agreement named "Reserve Partnership" and each partner assigned all of its Reserve assets to the partnership.

In 1982, Reserve and Minnesota Power began negotiating a transaction to construct a connecting transmission line be-tween Taconite Harbor, Minnesota and Reserve's facility at Silver Bay to enhance the service provided by Minnesota Power. Reserve was required to pay almost $6,000,-000 in "contribution in aid of construction" ("CIAC") under the agreements for the cost of the tie-line construction and related facilities in a lump sum upon completion of the construction. Reserve proposed deferring payment over a period of years and D.D. Gustafson, Controller of Reserve, met with Arend Sandbulte, then Executive Vice President of Minnesota Power, to discuss the matter. Gustafson emphasized Armco's financial strength and its responsibility for Reserve. The district court found that Gustafson did not inform Sandbulte of the restructuring or of the formation of Reserve Partnership. Minnesota Power's CIAC proposal contained a paragraph asking if Armco was the ultimate security in the transaction and asking for clarification if that understanding was wrong.[3] Reserve never responded to that request but submitted its own proposal. The two parties eventually reached agreement but nothing further was said about Armco as security.

Republic–Reserve and First Taconite eventually amended the partnership agreement and renamed the partnership "Reserve Mining Company."[4] Although Arm-

---

**2.** Republic filed bankruptcy in 1986.

**3.** On September 10, 1982, Sandbulte sent a letter to Matthew R. Banovetz, President of Reserve, with a copy to Gustafson. It stated in part:

It is our understanding, in discussions with Mr. D.D. Gustafson, that Reserve Mining Company operates under a mortgage indenture and certain cash deficiency agreements which provide assurance to Minnesota Power that the CIAC and interest payments will be paid on a timely basis pursuant to the terms of this letter. Any shortfall of operating funds which might be the result of a low level of operations by Reserve will be funded by the parent companies, Armco, Incorporated, and Republic Steel Corporation, pursuant to the above-mentioned documents. It is our further understanding that the 60 monthly payments outlined in this letter will be made by Reserve in the normal course of business from its available working funds. *To us, this in turn means that the full faith and credit of the parent companies, Armco and Republic, may reasonably be considered by Minnesota Power as the ultimate security in this transac-tion. If our understanding as outlined in this paragraph is incorrect, we would appreciate being so advised. If we are incorrect, we reserve the right to review this matter with you further before agreeing to the CIAC principal and interest payment procedures outlined earlier in this letter.*

Appellant's App. at 189 (emphasis added).

**4.** The restated partnership agreement also prohibited Reserve from incurring any trade debt without a limited recourse waiver in which the creditor agreed to look only to the partnership assets to satisfy its debts. Minnesota Power was not asked to sign such a waiver or accept the assignment of the agreements. Armco, Republic, First Taconite, Republic–Reserve, Reserve, and Reserve Partnership entered into an Omnibus Agreement of Assignment and Assumption on December 31, 1982. Pursuant to the agreement, Armco and Republic took all of Reserve's assets, except for $50,000. Armco assigned to First Taconite its share of the assets as a capital contribution and First Taconite assigned the assets to Reserve Partnership. First Taconite declared bankruptcy in August, 1986.

co and Republic disclosed Reserve's reorganization to other creditors, they did not notify Minnesota Power.[5]

ANALYSIS

Armco challenges certain findings of the district court relating to the alter ego theory. Although substantial evidence exists to support the district court's finding that Reserve was the alter ego of Armco at the time Reserve entered into the contract with Minnesota Power, there can be little question that upon restructuring Reserve in 1979, Armco became a partner through First Taconite in the newly formed Reserve Partnership. Armco created First Taconite, a corporation, solely to hold Reserve assets on behalf of Armco. The district court's finding that First Taconite was simply a "paper" corporation serving as Armco's alter ego is subject to little dispute. Thus, under basic principles of partnership law, Armco was liable for the debts of Reserve at the time of the contract breach.

The district court found the operating characteristics of First Taconite as a partner in Reserve Partnership were as follows:

(a) *Directors and Officers.* All directors and officers of First Taconite were appointed by Armco and were full time employees of Armco. The Board of Directors of First Taconite did not conduct any actual meetings until August of 1986, when it decided to place Reserve Partnership in bankruptcy. Prior to August of 1986, all actions by the directors of First Taconite were taken by consent action without a meeting.

(b) *Financing.* Armco provided the financing for all of the operations of First Taconite. The initial capital contribution of $500, made on behalf of First Taconite to start up Reserve Partnership, was actually advanced by Armco since First Taconite had zero funds. The annual fees paid to the State of Minnesota for First Taconite's registration as a foreign corporation, together with license fee and annual report charges, were paid by Armco. Prior to its bankruptcy proceeding, First Taconite did not pay any expenditure. All expenditures incurred by First Taconite were paid by Armco. To file bankruptcy, First Taconite obtained a loan from Armco to cover the filing costs and fees. First Taconite was never provided with funds to repay that loan or any other loan from Armco.

(c) *Employees.* First Taconite had no employees. All actions taken in the name of First Taconite were taken by employees of Armco, who were paid solely by Armco. While Armco assessed a monthly administrative charge to the intercompany account at First Taconite for services rendered by Armco employees to First Taconite, and for other costs advanced on its behalf, First Taconite never paid that monthly charge, was never provided capital funds with which to pay such a charge and was never requested to pay the charge.

(d) *Office.* First Taconite had no address or office location. While certain First Taconite files were maintained in the offices of Armco, there was no lease agreement or any identification within the Armco building of the presence of First Taconite. First Taconite's initial letterhead was entitled "First Taconite Company, % Armco, Inc." and this was the official address for its bank account.

(e) *Property.* Outside of its $1,000 cash balance in its bank account, First Taconite had no other property, offices, facilities, furniture or equipment. First Taconite did not have any storage facilities, processing plants or plants of any kind.

(f) *Bank Account.* Armco controlled First Taconite's bank account. The selection of the Chase Manhattan Bank for the account was a result of Armco's practice of having its subsidiaries' accounts where it banked. First Taconite's bank account never had an ending daily balance in excess of $1,000. First Taconite was not provided with sufficient cash to pay operating expenses and was never permitted to control even the

---

**5.** Reserve's agreements with Minnesota Power allowed assignments only if Minnesota Power agreed in writing. The district court found no notice was given.

$1,000 in cash which Armco placed in its account.

(g) *Business Purpose.* First Taconite had no business purpose except to act as nominee of Armco to hold the partnership interest in Reserve Partnership. First Taconite did not become a party to either the Ore Agreements or Unequal Take Agreements. It was ignored by Armco and Republic, who continued as the direct parties to those Agreements. Pellets produced by Reserve Partnership were not delivered to First Taconite, but were delivered directly to Armco facilities. All pellets were priced pursuant to the Ore Sales Agreement between Armco, Republic and Reserve Partnership. First Taconite did not become a party to that Agreement. First Taconite did not borrow any money or enter into contracts with any third parties.

(h) *Corporate Action.* First Taconite could not take any action without the consent of Armco.

(i) *Environmental Permits.* First Taconite was not named on any environmental permits for Reserve. The permits continued to be in the names of Armco, Republic and Reserve.

32. Under the Restated Partnership Agreement, the business of Reserve Partnership was conducted by a Board of Directors. The Reserve Partnership Board was always comprised on [sic] an equal number of Armco employees and Republic employees. While Banovetz, as President of Reserve Partnership, was also a director, he did not have the power to act as tie-breaker since the Restated Partnership Agreement required all corporate actions to be unanimously approved by the Armco and Republic representatives on the Board. When differences of opinion existed Banovetz would simply withdraw from the discussion until the matter was resolved. The Executive Committee of Reserve Partnership continued to be comprised of two employees of Armco and two employees of Republic. None of the Armco representatives on the Board of Directors of Reserve Partnership, and none of the Armco representatives on the Executive Committee of the Reserve Partnership, were officers of First Taconite.

34. After December 1, 1983, Reserve Partnership's lines of credit were cancelled and its bank accounts were managed by Armco and Republic to continuously be a "zero balance." Reserve Partnership would draw checks against the account. When the checks were presented for payment, the bank would call Reserve Partnership who would call Armco and Republic, who would wire transferred [sic] to the Reserve Partnership account, through First Taconite and Republic Reserve, sufficient funds to cover the checks.

35. All cash advances made to Reserve through First Taconite's bank account came from Armco.

Mem. op. at 15–18.

■ Under Minnesota law, piercing the corporate veil requires (1) analyzing the reality of how the corporation functioned and the defendant's relationship to that operation, and (2) finding injustice or fundamental unfairness.

> Factors considered significant in the determination include: insufficient capitalization for purposes of corporate undertaking, failure to observe corporate formalities, nonpayment of dividends, insolvency of debtor corporation at time of transaction in question, siphoning of funds by dominant shareholder, nonfunctioning of other officers and directors, absence of corporate records, and existence of corporation as merely facade for individual dealings.
>
> Disregard of the corporate entity requires not only that a number of these factors be present, but also that there be an element of injustice or fundamental unfairness.

*Victoria Elevator Co. of Minneapolis v. Meriden Grain Co.,* 283 N.W.2d 509, 512 (Minn.1979) (citing *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.,* 540 F.2d 681, 685–87 (4th Cir.1976)); *see also West Concord Conservation Club, Inc. v. Chilson,* 306 N.W.2d 893, 898 n. 3 (Minn. 1981).

■ Armco initially argues that the district court should have applied the "consensual creditor rule" discussed in *G.G.C. Co. v. First National Bank of St. Paul*, 287 N.W.2d 378 (Minn.1979). It argues that Minnesota Power was a sophisticated creditor that could look out for itself. *Id.* at 384 (citing Note, *Disregard of the Corporate Entity*, 4 Wm. Mitchell L.Rev. 333, 356 (1978)). As the district court found, however, the consensual nature of the transaction was tainted by· the nondisclosures regarding Armco's restructuring of Reserve.[6] The district court made extensive findings of fact supporting the claim that Reserve and First Taconite were the alter egos of Armco.

Notwithstanding conflicting inferences argued by Armco, substantial evidence exists supporting the district court's findings of fact. We hold that these findings are not clearly erroneous. In addition, we cannot agree with Armco's claim that these findings were induced by an erroneous application of Minnesota law.

The manner in which Armco managed Reserve and First Taconite fulfills the first requirement of the *Victoria Elevator* test. Both companies were undercapitalized and the officers and directors were non-functioning with little or no power. Reserve did not inform Minnesota Power of its restructuring or of the existence of First Taconite. It also did not ask Minnesota Power to sign the limited recourse waiver that Reserve's partnership agreement contained, prohibiting Reserve from incurring any trade debt.

Sufficient evidence exists to support the district court's conclusion that the injustice requirement was met, allowing the district court to pierce Reserve's corporate veil. Armco's silence in the CIAC transactions prejudiced Minnesota Power and also supports the injustice prong. *See Florenzano v. Olson*, 387 N.W.2d 168, 174 (Minn.1986). As a general rule in Minnesota, a party has no duty to disclose material facts absent special circumstances. *Hommerding v. Peterson*, 376 N.W.2d 456, 459 (Minn.Ct. App.1985). However, parties who speak must not be misleading, parties with access to special facts to which the other party does not have access may have to disclose those facts, and parties in a fiduciary or confidential relationship must disclose material facts. *Id.*

In this case, Armco and Reserve had special knowledge of material facts to which Minnesota Power did not have access. Minnesota Power was not on any notice that a reorganization had occurred because no changes were made in Reserve's outward appearance.[7] Reserve chose not to reply to Minnesota Power's inquiry regarding Armco as security. Minnesota Power did not have a duty of inquiry because the agreements required Reserve to obtain Minnesota Power's written acceptance of an assignment.

CONCLUSION

We find that Reserve and First Taconite were alter egos of Armco. Armco created the companies to take advantage of the principle of limited liability. *Victoria Elevator*, 283 N.W.2d at 512. We hold that the district court's findings of fact are not

---

**6.** The district court did not decide the consensual creditor issue because Minnesota Power had independently established under *Victoria Elevator* that Armco's dealings through Reserve satisfied the second requirement of injustice. Mem. op. at 29 n. 2.

In *Chilson*, the Minnesota Supreme Court cited *Victoria Elevator* favorably and discredited *G.G.C.* by stating:

In *G.G.C. Co. v. First Nat'l Bank of St. Paul*, 287 N.W.2d 378 (Minn.1979), this court stated that disregard of the corporate entity is equitable in nature, and generally not available, absent fraud. *Id.* at 384. However, proof of strict common law fraud is not required, but, rather, evidence that the corporate entity has

been operated as a constructive fraud or in an unjust manner must be presented. *See Victoria Elevator Co. v. Meridan Grain Co.*, 283 N.W.2d 509, 512 (Minn.1979).

*Chilson*, 306 N.W.2d at 898 n. 3; *see also White v. Jorgenson*, 322 N.W.2d 607, 608 (Minn.1982); *Miller & Schroeder, Inc. v. Gearman*, 413 N.W.2d 194, 196 (Minn.Ct.App.1987).

**7.** Although a May 22, 1980, Bond Memorandum between Reserve and Minnesota Power does state that Reserve will eventually be reorganized because its cost company status was terminated, the agreement did not state when this would happen. Appellant's App. at 182.

clearly erroneous. There is sufficient evidence that the companies are alter egos of each other and that injustice and fundamental unfairness permeated the dealings between Armco, Reserve, First Taconite, and Minnesota Power. Accordingly, we affirm the judgment of the district court.