**FIRST CITY SECURITIES, INCORPORATED, Plaintiff–Appellee, Cross–Appellant,**

v.

**Moshe SHALTIEL and Riga International, Defendants–Appellants, Cross–Appellees.**

Nos. 93–3347, 93–3511 & 93–3901.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 9, 1994.

Decided Jan. 5, 1995.

A. Benjamin Goldgar, Jonathan G. Bunge, Keck, Mahin & Cate, Chicago, IL, Cary B. Samowitz, Keck, Mahin & Cate, Mathew E. Hoffman (argued), Rosen & Reade, New York City, for plaintiff-appellee in No. 93–3347.

Gerald B. Mullin (argued), Rosenthal & Schanfield, Peter Flynn, Myron M. Cherry, David D. Merritt, Cherry & Flynn, Chicago, IL, for defendant-appellant in No. 93–3347.

A. Benjamin Goldgar, Jonathan G. Bunge, Scott R. Lassar, Angela Marsh, Roland Spies, Marianne C. Holzhall, Keck, Mahin & Cate, Chicago, IL, Cary B. Samowitz, Keck, Mahin & Cate, Mathew E. Hoffman (argued), Rosen & Reade, New York City, for plaintiff-appellant in No. 93–3511.

Gerald B. Mullin (argued), Rosenthal & Schanfield, Myron M. Cherry, David D. Merritt, Cherry & Flynn, Chicago, IL, for defendant-appellee in No. 93–3511.

A. Benjamin Goldgar, Jonathan G. Bunge, Angela Marsh, Keck, Mahin & Cate, Chicago, IL, Cary B. Samowitz, Keck, Mahin & Cate, Mathew E. Hoffman (argued), Rosen & Reade, New York City, for plaintiff-appellee in No. 93–3901.

Gerald B. Mullin (argued), Rosenthal & Schanfield, Peter Flynn, Myron M. Cherry, David D. Merritt, Cherry & Flynn, Chicago, IL, for defendant-appellant in No. 93–3901.

Before FLAUM, EASTERBROOK, and ROVNER, Circuit Judges.

EASTERBROOK, Circuit Judge.

Moshe Shaltiel, a stockbroker from Chicago, met Samuel Belzberg, an entrepreneur and financier from Vancouver, while the two were on vacation in California. After several years of social friendship, Belzberg proposed that the pair join forces in making investments. Belzberg and his firms (First City Financial Corporation and its many affiliates) would put up the money for investments Shaltiel selected; the two would share profits, and in exchange for access to the funds Shaltiel undertook to bear all losses. On one of the investments, a substantial bloc of shares in Reebok International, Ltd., Shaltiel lost approximately $1.6 million. Shaltiel caused Riga International, a Panamanian firm he controls, to sign a promissory note for this sum, payable to First City Securities, Inc. (FCS); he guaranteed payment of Riga's note. Riga and Shaltiel (collectively Shaltiel) have not paid—at least not in cash, a qualification that occupies the bulk of this opinion—and after Belzberg's own unsuccessful investments cost him control of his empire, FCS filed this action under 28 U.S.C. § 1332(a)(3) seeking payment. (Samuel Belzberg was involved in many corporate control transactions during the 1980s and has been given credit for provoking the Pennsylvania legislature to enact the most stringent of the anti-takeover laws. See Jeffrey L. Silberman, *How Do Pennsylvania Directors Spell Relief? Act 36,* 17 Del.J.Corp.L. 115, 130 (1991); see also John Pound, *The Rise of the Political Model of Corporate Governance and Corporate Control,* 68 N.Y.U.L.Rev. 1003, 1033 (1993); M. Wayne Marr Jr., *Effects of the Antitakeover Provisions of Pennsylvania Act 36: A Survey of Empirical Studies,* Financial Analysts J. 52 (Nov./Dec. 1992).)

In the district court, Shaltiel resisted payment on the note by presenting a series of defenses that can charitably be called fanciful. The district court rejected

them after a bench trial, and all except an objection to the amount of interest have been abandoned on appeal. The note provides for interest "calculated monthly." Under Illinois law (which the parties agree governs) compound interest is available only if the parties specifically provide for it. *Harrington v. Kay*, 136 Ill.App.3d 561, 91 Ill.Dec. 214, 483 N.E.2d 560 (1st Dist.1985). The district judge concluded that "calculated" means "compounded," and this conclusion is not clearly erroneous. FCS sent Shaltiel statements showing compounding; he did not object, and the omission is persuasive evidence of the parties' meaning. Expert testimony concerning trade usage supports the judge's conclusion. Compounding is the norm in financial transactions, and it is hard to see what function "calculated monthly" serves except to provide for monthly, rather than daily, compounding. The district court correctly concluded that the note, with interest through mid–1993, established a debt of approximately $3.35 million.

Given the terms of the note and guarantee, the only available defense is payment. Shaltiel believes that he paid by making profitable trades with additional funds Belzberg lent him. The parties hotly dispute just which firm within the corporate family advanced the funds and how intra-family transfers were to be handled. A month before the trial was to begin, Shaltiel attempted to amend his answer and counterclaim to add two additional firms. According to Shaltiel, Belzberg promised him that details of corporate structure would not matter. Belzberg's successors are more punctilious about form, which led Shaltiel to believe that the cast of characters in the original complaint and answer is incomplete. The district court denied the motion to add new parties and concluded, after the trial, that it is not possible to determine which firms played which roles. We need not decide whether these decisions are mistaken, because on the view we take of things the allocation across corporations is irrelevant. We shall assume that all of the money was advanced by, and all transactions conducted through, FCS. To simplify this opinion, we use FCS as the name of all corporate entities.

FCS set up and funded a trading account for which Shaltiel acted as both adviser and broker. He received regular brokerage commissions on trades. Shaltiel was entitled to 20% of the profits in the account (after the cost of the funds was credited to FCS) and was responsible for 20% of the losses. Shaltiel denies that he bore any responsibility for losses, but the evidence to the contrary is overwhelming. Regular statements and other documents show Shaltiel being credited with 20% of the profits and charged with 20% of the losses; he never protested. Shaltiel's net profits were to be used to repay the Reebok note. The parties have two major disputes: first, were profits to be credited irrevocably while they remained at risk in the account?; second, when was the trading relation concluded for purposes of determining net profits? The district judge concluded that neither party carried its burden on the first question, leading her to hold that the second question need not be answered. We conclude that the judge's disposition of the first question is clearly erroneous and remand for a disposition of the second.

In refusing to assign liability to either side, the judge was influenced by her belief that Shaltiel and Belzberg were engaged in "legalized gambling." This is an odd term to use for risk arbitrage in tender offers and other corporate control transactions. Instruments such as puts, calls, and options are volatile, and most persons other than professional investors find them inscrutable, but arbitrage is an important contributor to liquidity and accurate pricing in securities markets. The participants ought not be castigated as if they were asking the court to sort out debts incurred while playing baccarat. When assessing the parties' positions, the district court also was influenced by the fact that no one document collects all details of the arrangement. The court thought something amiss. If this were a suit on an executory contract, the failure to commit essential terms to a signed writing could be dispositive. Yet these parties' affairs have been concluded; there is nothing contingent or uncertain. Business executives frequently conduct important transactions on handshakes, relying on their reputational interests (and the other side's interest in securing

performance) rather than the skills of lawyers. Instead of attempting to discern whose testimony was more credible, the district court should have made full use of the paper record—not to cobble together a document looking like a contract but to find out how these parties conducted their affairs. What actually happened, and memoranda exchanged without protest from either side, is by far the best evidence of these transactions. The details are essentially undisputed; only their significance divides the parties.

When the trading account showed profits realized by the closing of positions (the expiration of options, the purchase of offsetting instruments, etc.), an accountant at FCS would treat Shaltiel's 20% as a credit against the Reebok note. Shaltiel's portion of the profit was not disbursed from the trading account to reduce the balance on the note, however. It remained in the account, reinvested in other securities. By the time all positions were closed, in December 1989, the account had more than $2 million in losses. Shaltiel believes that the paper profits in earlier months served as irrevocable credits on the note, reducing the balance despite the later reverses. The accounting memos are his only tangible proof that this was supposed to happen, but it is an inescapable fact that it did not happen. No money was removed from the account; every penny remained at risk. Investments of the kind Shaltiel and Belzberg made are highly variable. Everyone understood at the outset that some periods would be up and others down. Only a fool would agree to credit one's trading partner with the up swings while bearing the risk of the losing transactions—and Shaltiel does not depict Belzberg as a fool. The testimony and the documents show that Shaltiel was free to ask for a distribution at any time; he could not get cash out for himself until the Reebok debt was paid in full, but he could end the trading arrangement in whole or in part in order to apply the profits to the note. It is equally clear that this did not occur while there were net profits. Whatever profits the account made were reinvested in pursuit of still higher profits. The statements sent to Shaltiel showed this; he never asked for a distribution and never protested the failure to distribute profits automatically.

The accounting memoranda served the function of showing the parties' positions if the trading arrangement were wound up. They were provisional credits; Shaltiel did not take the step essential to make the provisional credits final.

Even if Shaltiel and Belzberg originally contemplated that net profits would be distributed as soon as they were realized, documents sent regularly to Shaltiel showed that this was not happening. By failing to complain, Shaltiel implicitly accepted the reinvestment—and reinvestment is inconsistent with irrevocable credit against the note. Having one's cake and eating it too (here, reinvesting profits and using them to pay debts too) is not an option available in financial markets. Shaltiel knew this; seeing the statements, he had to choose which course to take. He chose reinvestment. An investor who reads his monthly statements and fails to protest accepts the trades made in his account, notwithstanding a belated claim that the trades were unauthorized. *Costello v. Oppenheimer & Co.*, 711 F.2d 1361, 1370 (7th Cir.1983); *Ocrant v. Dean Witter & Co.*, 502 F.2d 854, 858–59 (10th Cir.1974). Shaltiel was in charge of the management of the account. He knew that profits were being rolled over, and he must accept the consequences.

This makes it important to know just when the trading arrangement ended: in June 1989, when Shaltiel was ahead, or later that year, when he was behind. Shaltiel prefers the earlier date (obviously), which he supports by testimony that the nature of the deal changed when Marc Belzberg, Samuel's son, intervened. Until mid–1989 Shaltiel recommended investments to Samuel Belzberg, and as Shaltiel recounts things this was equivalent to having the final say (or at least to having a partner whose views were as likely as his own to yield profit). Shaltiel depicts Marc Belzberg as a bungler who blocked profitable investments and insisted on losing ones. When Shaltiel complained, Samuel Belzberg took his son's side, and the account went downhill. Or so Shaltiel says; FCS depicts matters differently, saying that Shaltiel retained effective control in the second half of 1989 and is responsible for the

losing investments that plagued the account. The parties agree that Shaltiel did not give a written notice of termination in mid–1989. His dissatisfaction with Marc Belzberg's actions cannot be deemed an end of things. Surely Shaltiel would not have turned away any profits earned in the second half of 1989. If, as Shaltiel says, he continued trading the account only because he had grown dependent on the brokerage commissions and did not want to anger Samuel Belzberg (and close the door on future opportunities), this merely demonstrates that he had reasons, satisfactory at the time, for continuing the trading arrangement. Shaltiel could not be "in" for purposes of commissions, friendship, future access, and whatever profits came his way, and "out" for purposes of losses. It was all or nothing, and a great deal of evidence suggests "all."

Still, some of FCS's internal memoranda suggest that the account was in liquidation after the summer of 1989 and that Shaltiel had lost control. If FCS did not plan to give Shaltiel the benefit of profits in that period, it cannot compel him to make good any losses. There is also the complication that the account made money in December 1989, so the date on which Shaltiel's withdrawal is deemed complete is significant to the judgment. The district judge did not suggest that it would be impossible to fix the terminal date of the arrangement; the court simply thought the exercise unnecessary in light of its other findings. Because this disputed factual issue has become material, the district court must make the initial finding. See *Icicle Seafoods, Inc. v. Worthington,* 475 U.S. 709, 106 S.Ct. 1527, 89 L.Ed.2d 739 (1986). The district court also should tie up any other loose ends that become significant once a terminal date has been established.

The district court gave a second reason—beyond the lack of a written contract and the evenly matched credibility of the testimony—for declining to order either party to pay anything on account of the trading arrangement. It is that Shaltiel served not only as broker but also as investment adviser to Samuel Belzberg and his corporations. An investment adviser in Illinois must hold a special license, but Shaltiel did not; he was registered as a broker but not as an investment adviser. The absence of a license barred both Shaltiel and FCS from enforcing their bargain, the district judge held.

Illinois defines an investment adviser as any person who, for compensation, engages in this State in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities or who, in this State for direct or indirect compensation and as part of a regular advisory business, issues or promulgates analyses or reports concerning securities or any financial planner or other person who, as an integral component of other financially related services, provides the foregoing investment advisory services to others for compensation and as part of a business or who holds himself or herself out as providing the foregoing investment advisory services to others for compensation; but "investment adviser" does not include: ... (3) any registered dealer or partner, officer, director or regular employee of a registered dealer, or registered salesperson, whose performance of these services, in each case, is solely incidental to the conduct of the business of the registered dealer or registered salesperson, as the case may be, and who receives no special compensation, directly or indirectly, for such services; ...

815 ILCS 5/2.11. Shaltiel advised the Belzbergs about the value of securities, and because he shared in the profits and losses he does not come within the exemption for dealers and salespersons. See also Louis Loss and Joel Seligman, VII *Securities Regulation* 3368–71 (3d ed. 1991) (discussing the parallel provision of the Investment Advisers Act of 1940). Other potential exemptions under 815 ILCS 5/4 were not raised in a timely fashion. Shaltiel should have registered as an investment adviser.

■ What follows from this? The district judge believed that all transactions with an unlicensed professional are invalid, and that each side therefore keeps its gains and bears its losses. Many Illinois cases say that particular unlicensed professionals are not enti-

tled to the benefits of his contract. See *U.S. Nursing Corp. v. St. Joseph Medical Center,* 39 F.3d 790 (7th Cir.1994) (collecting and discussing Illinois precedent); *Rush–Presbyterian–St. Luke's Medical Center v. Hellenic Republic,* 980 F.2d 449, 455–56 (7th Cir.1992) (discussing limits to this principle). It is far from clear to us that Illinois would prevent an unlicensed professional's trading partners from recovering for loss. At all events, the rule that unlicensed professionals cannot obtain the benefit of their bargains was developed at common law. It does not supersede statutes specifying different consequences. Illinois provides express civil remedies for improper (including unlicensed) transactions in securities: sales are voidable if the aggrieved party acts within six months of learning about the impropriety and within three years of the original sale; equitable relief is another option. 815 ILCS 5/13. Declaring contracts invalid after the six months for rescission have run would disrupt this scheme. There is a big difference between a void contract (the district court's view of the trading arrangement) and a sale voidable by election within a specified time. State courts have held that a purchaser who elects not to rescind the transaction within six months may not thereafter raise a violation of the act as a defense to enforcement of the contract. E.g., *Bain v. Financial Security Life Insurance Co.,* 53 Ill.App.3d 702, 11 Ill.Dec. 415, 419, 368 N.E.2d 1023, 1027 (5th Dist.1977); *Freiner v. Lane,* 302 Ill.App. 248, 23 N.E.2d 750, 753 (4th Dist.1939); *Pelham v. Hopper,* 302 Ill.App. 51, 23 N.E.2d 389 (1st Dist.1939). Following suit, federal courts likewise have declined to expand the remedies that 815 ILCS 5/13 provides. *Carlson v. Bear, Stearns & Co.,* 906 F.2d 315, 317 (7th Cir. 1990); *Reshal Associates, Inc. v. Long Grove Trading Co.,* 754 F.Supp. 1226, 1236 (N.D.Ill. 1990) (Rovner, J.). We asked counsel at oral argument whether they knew of any Illinois case treating the lack of a necessary license in the securities business as rendering the contract void, and therefore unenforceable without regard to delay in raising such a claim. Neither side knew of such a case; our research did not turn one up. FCS did not seek to rescind within six months; indeed, it did not object within three years.

Instead it filed suit in 1992 seeking to *enforce* both the note and the trading agreement. That is inconsistent with a demand to avoid the agreement belatedly, even if that remedy were available under Illinois law—which it is not. Shaltiel's failure to register as an investment adviser therefore is not pertinent to the disposition of this case.

One final observation. If the district court decides that the trading arrangement ended when Shaltiel was ahead, then our simplifying assumption about the corporate structure of the Belzbergs' financial empire may need modification. Despite the district judge's agnosticism, we are confident that FCS is entitled to collect any net liability. If Shaltiel was ahead, things are murkier. Most of the trading occurred through, and the funds and securities were held by, Hornby, a fraternal corporation that was spun off after the start of this litigation. If the district judge concludes that Hornby should have distributed profits to FCS for Shaltiel's benefit, it must decide where the liability came to rest. When the split-up occurred, which firm or firms assumed the potential liability to Shaltiel? If the answer is that Hornby's successor did so, the district judge should reexamine her decision not to permit Shaltiel to add that firm as a party. If, however, FCS or another affiliate retained this potential liability, then there is no need to alter the alignment of parties. Because this question assumes significance only if the district court decides in Shaltiel's favor on the termination date, we need not pursue it further now.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.