STAHL, Circuit Judge, dissenting.
I believe the majority misreads the record and misapprehends the federal law on piercing the corporate veil. Consequently, I disagree with the majority’s conclusion that the lower court properly pierced Springfiéld’s corporate veil to enjoin ABR from doing switching work previously performed by Springfield. Accordingly, I dissent.
The majority’s determination that ABR is subject to the RLA depends necessarily on its affirming the district court’s holding that “the close family relationship” between ABR and Springfield, Brotherhood of Locomotive Eng’rs v. Springfield Terminal Ry., Civil No. 98-284-P-H, slip op. at 9, 1999 WL 1142924 (D.Me. Feb. 5, 1999), justifies the conclusion that Springfield unilaterally brought about a change in working conditions in violation of the collective bargaining agreement by “directing]” the Lincoln and Champion switching work to ABR. See ante at 26. The majority acknowledges, as do the Unions, that without finding ABR to be an alter ego — for which there is no record evidence[1] — or a piercing of the corporate veil, it could not hold ABR liable under the RLA. In my view, the district court’s conclusion is not sustainable.
*35 Before proceeding to discuss the issues before us, I must contend with how the majority couches its factual recitation. The majority states its intention to “begin by sketching the facts of this labor dispute, reserving for later a more detailed discussion of the district court’s findings.” Ante at 2. What follows, however, intermixes predicate facts in the evidence with the actual findings the district court made. To an uninformed reader, this intermixing of facts and the district court’s findings might well be quite confusing. The effect is to bolster the majority’s ultimate conclusion, which is not sustainable based solely on the district court’s findings, with bits and pieces of evidence from the record. I believe this approach is unfortunate.[2]
The majority suggests that ABR made each decision relating to switching solely to satisfy Springfield’s goals. Neither the district court’s findings nor the record supports such a contention. In early 1998, because its operations were growing, ABR decided it needed to provide additional trackage for the storing, loading, unloading, and switching of railroad cars over the two sidetracks that it owned and over which it had exclusive use. To satisfy- its operational needs, it negotiated with its line-hauling carrier, Springfield, a standard joint use agreement, which is a contract by which a company obtains the use of a railroad’s tracks for its own operations. Under this agreement, ABR to complement its own two tracks obtained the right to use four contiguous tracks owned and controlled by Springfield.
It is evident from the record that ABR received no special treatment from Springfield because this agreement was identical to joint use agreements the railroad previously had negotiated with other customers. Long before ABR negotiated its agreement, Springfield had entered into similar joint use agreements with S.D. Warren of Westbrook, Maine in August 1992; Specialty Minerals, Inc. of Adams, Massachusetts in October 1996; and Turners Island LLC of South Portland, Maine in October 1997. In addition, Springfield had assisted several companies without joint use agreements- — Merrill’s Terminal of Portland, Maine in 1990; Hampshire Chemical of Nashua, New Hampshire in 1995; and Fort James of Old Town, Maine in 1996— in taking over their own switching. Like ABR, each company is a freight customer of Springfield’s, each had ceased using Springfield for intraplant switching, and each had begun to perform its own switching. Moreover, in each of these instances, the shipper made the decision to do its own switching, and Springfield trained employees of each company in the operation of the trackmobile, a device used to move rail cars between tracks.
In April 1998, ABR, motivated by a desire to increase its flexibility and efficiency in switching, decided to do its own intra-plant switching.[3] The district court found *36 that to accomplish its goals, ABR leased from Maine Central Railway a trackmo-bile, and two of ABR’s employees received training in its operation from two Springfield employees. See Brotherhood of Locomotive Eng’rs, Civil No. 98-284-P-H, slip op. at 4, 1999 WL 1142924. The record is clear that this assistance was neither unusual nor improper because it followed Springfield’s normal practice when current line-haul customers elected to do their own switching. From Springfield’s point of view, this assistance had a legitimate business purpose because the more efficient a customer became at switching, the more line-haul business that customer could give to Springfield.
Around the time that ABR decided to do its own switching, Lincoln and Champion complained that Springfield was unable to meet their scheduling needs for switching. Lincoln and Champion discussed with Springfield their intention to perform their own switching. The majority contends that Springfield “directed” or “transferred” switching work to ABR. Ante at 26 & n. 8. Respectfully, I think this assertion misstates the record.[4] It was only after Lincoln and Champion had decided to leave Springfield[5] that Sydney Culliford, Vice President of Transportation for Springfield, suggested to David Armstrong Fink that if ABR were not using its track-mobile to full capacity, it could maximize its use by also performing switching services for other industries that wished to do their own switching. Because Lincoln and Champion already had decided that Springfield could not meet their switching needs when they began to use ABR, it is illogical to suggest that Springfield “directed” or “transferred” this business to ABR. After all, a company cannot transfer business it does not have.[6]
The Unions and the majority make much of Culliford’s suggestion. This suggestion, however, is unremarkable because it does not indicate that either Springfield or ABR were using the corporate form as *37 a rase. The record is devoid of evidence to indicate that Culliford acted at the instruction of any of the owners of Guilford or ABR when he made his suggestion to ABR management. Culliford is neither an owner nor a director of Guilford, Springfield, or ABR. More importantly, his suggestion made legitimate business sense for both companies because ABR could maximize its use of switching capabilities otherwise underutilized, and Springfield could ensure an expansion of its line-hauling business. A helpful suggestion from one company to another does not create an alter ego relationship or provide a basis for piercing the corporate veil.[7]
The majority’s assertion that the railroad’s attempt to renegotiate is further proof of collusion misses the mark. Rather, Springfield’s continued attempts to renegotiate its union contract indicate that the railroad desired to save its switching business if it could, but recognized the need to decrease its costs to be competitive. A more realistic view than that advanced by the majority is that if Springfield and ABR truly were colluding, once Springfield “transferred” its switching work to what the majority says is its alter ego, ABR, it would have given up on trying to renegotiate the Union contract because its goals already would have been realized.
The majority also misconstrues the applicable legal standards. After explaining that federal law controls whether to disregard the corporate form, the majority misreads and overstates that law. The majority contends that federal common law allows courts in cases involving federal statutes to fashion new, statute-specific rules for disregarding the corporate form. I do not agree.
While the majority is correct that in ERISA cases, we have crafted “a ‘less rigorous’ veil-piercing standard,” ante at 13, we have not crafted one that is stan-dardless. Contrary to the majority, which contends that veil piercing typically is appropriate to effectuate legislation,[8] this court always has engaged in a more searching inquiry. See United Elec., Radio & Mach. Workers v. 163 Pleasant St. Corp., 960 F.2d 1080, 1092-93 (1st Cir.1992). Common ownership alone is insufficient to justify piercing the veil. See United Paperworkers Inti, Union v. T.P. Property Corp., 583 F.2d 33, 35-36 (1st Cir.1978); ante at 19. Moreover, the mere existence of a parent-subsidiary relationship is insufficient to justify piercing the veil.[9] See American Bell Inc. v. Federa *38 tion of Tel. Workers, 736 F.2d 879, 887 (3d Cir.1984) (“As [the First Circuit] has explained, there is no policy of federal labor law, either legislative or judge-made, that a parent corporation is bound by its subsidiary’s labor contracts simply because it controls the subsidiary’s stock and participates in the subsidiary’s management.” (citing United Paperworkers, 583 F.2d at 35-36)). Instead,
[a] court using the federal standard should consider (1) whether the parent and the subsidiary ignored the independence of their separate operations, (2) whether some fraudulent intent existed on the principals’ part, and (3) whether a substantial injustice would be visited on the proponents of the veil pierce should the court validate the corporate shield.
163 Pleasant, 960 F.2d at 1092-93. As the 168 Pleasant court noted, “fraudulent intent is the sine qua non to the remedy’s availability.” Id. at 1093; see also id. at 1095 (“Veil piercing cannot occur without some degree of moral culpability on the parent corporation’s part.”); American Bell, 736 F.2d at 886-87 (finding piercing appropriate only when “the corporations simply acted interchangeably and in disregard of their corporate separateness” (internal quotation marks and citations omitted)). Of course, courts will raise questions when the purpose of incorporation was to avoid a legislative dictate,[10] see Note, Piercing the Corporate Law Veil: The Alter Ego Doctrine Under Federal Common Law, 95 Harv. L.Rev. 853, 869 (1982), but “[t]he true test must be whether the corporation was created for a legitimate business purpose or primarily for evasion of a federal policy or statute,” id. at 868.
This case presents no evidence of fraudulent intent[11] nor any evidence of a lack of corporate independence. ABR was formed to operate a sawmill and a wood products plant. See Brotherhood of Locomotive Eng’rs, Civil No. 98-284-P-H, slip op. at 2, 1999 WL 1142924. It is not a shill. It began its operations not after, or as a result of, the railroad’s faded negotiations with the Unions, but in 1994, which was two years before the labor contract even began. It began switching to satisfy its own production needs. It shares with Springfield neither books, funds, nor of *39 fices. It shares with Springfield no corporate officers and with the exception of David Armstrong Fink, who is the president of ABR and a vice-president of Springfield, no common employees. Indeed, all it does share with Springfield is some ownership congruence, but the record is silent on the degree of that overlap because it fails to indicate what percentages of each company the Finks and Mellon own.[12]
The majority buttresses its decision to pierce the corporate veil with cases that are inapplicable to the facts before us.[13] To justify disregarding the corporate form in a case with mere ownership overlap, the majority relies entirely on cases that involve wholly owned subsidiaries. See ante at 17-19 (discussing Burlington, 862 F.2d 1266; Butte, Anaconda & Pac. Ry. v. Brotherhood of Locomotive Firemen & Enginemen, 268 F.2d 54 (9th Cir.1959)). For example, in Butte, the railway was “a wholly-owned subsidiary of Anaconda, and both corporations-[were] managed by the same staff of officers from president down to secretary-treasurer.” Butte, 268 F.2d at 55. ABR is not a subsidiary of Springfield or Guilford, and the companies are not managed by the same personnel. In Butte, the officers who made all major policy decisions for the subsidiary were also officers of the parent, and as one might expect, their “controlling consideration” always was “the ultimate effect” the decision would have on the parent’s profits. Id. No officers of ABR are officers of Springfield or Guilford. While the majority speculates that ABR’s decisions were made for the sole benefit of Springfield, no record evidence supports that conclusion.
The majority attempts to extend the rule from these parent-subsidiary cases to this case, but does not satisfactorily justify or explain the extension. The majority uses the fact that Burlington, a Seventh Circuit case, employs the phrase “the same corporate family to justify piercing the veil in this case. See ante at 18. All of the cases Burlington cites after this language, however, involve wholly owned subsidiaries. See Burlington, 862 F.2d at 1275 (citing Burlington N. R.R. v. United Transp. Union, 688 F.Supp. 1261, 1266-67 (N.D.Ill.1988) (the district court opinion); International Ass’n of Machinists & Aerospace Workers v. Eastern Airlines, No. 87-1720, 1988 WL 25506 (D.D.C. Mar. 10, 1988), vacated and remanded on other grounds, 849 F.2d 1481 (D.C.Cir.1988); *40 Butte, 268 F.2d 54). Moreover, every time the term “corporate family” has appeared in a Seventh Circuit opinion, it has referred not to a mere overlap in ownership, but to corporations within a parent-subsidiary relationship. See In re Meyer, 120 F.3d 66, 69 (7th Cir.1997); Fitzgerald v. Chrysler Corp., 116 F.3d 225, 228 (7th Cir.1997); Northern Ind. Pub. Serv. Co. v. C.I.R., 115 F.3d 506, 514 (7th Cir.1997); In re Vicars Ins. Agency, Inc., 96 F.3d 949, 950 & n. 1 (7th Cir.1996); Addis v. Holy Cross Health Sys. Corp., 88 F.3d 482, 484 (7th Cir.1996); Kusak v. Ameritech Info. Sys., Inc., 80 F.3d 199, 201 (7th Cir.1996); Central States, Southeast & Southwest Areas Pension Fund v. Sherwin-Williams Co., 71 F.3d 1338, 1342 (7th Cir.1995); Baeco Plastics, Inc. v. Inacomp Fin. Servs., Inc., No. 94-3391, 51 F.3d 275, 1995 WL 140720 (7th Cir. Mar. 29, 1995); First City Sec., Inc. v. Shaltiel, 44 F.3d 529, 531 (7th Cir.1995); Sears, Roebuck & Co. v. C.I.R., 972 F.2d 858, 860-61 (7th Cir.1992); Fought v. Evans Prods. Co. Racine Pension Plan Agreement, 966 F.2d 304, 305 (7th Cir.1992); Olympia Equip. Leasing Co. v. Western Union Tel. Co., 786 F.2d 794, 802 (7th Cir.1986) (Easterbrook, J., concurring); Independence Tube Corp. v. Copperweld Corp., 691 F.2d 310, 317 n. 5 (7th Cir.1982), rev’d; 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984); Photovest Corp. v. Fotomat Corp., 606 F.2d 704, 726 (7th Cir.1979); Radiant Burners, Inc. v. American Gas Ass’n, 320 F.2d 314, 324 (7th Cir.1963). The same holds true for First Circuit cases. See CPC Int’l, Inc. v. Northbrook Excess & Surplus Ins. Co., 144 F.3d 35, 37 (1st Cir.1998); Donatelli v. National Hockey League, 893 F.2d 459, 466 (1st Cir.1990); Barrett v. Continental Ill. Nat’l Bank & Trust Co., 882 F.2d 1, 3 n. 2 (1st Cir.1989); Pujol v. Shearson Am. Express, Inc., 877 F.2d 132, 136 (1st Cir.1989); San Francisco Real Estate Investors v. Real Estate Inv. Trust of America, 701 F.2d 1000, 1001 (1st Cir.1983); Ladd v. Brickley, 158 F.2d 212, 220 (1st Cir.1946). The majority thus has little basis upon which to hold that Burlington’s use of the phrase “corporate family” was meant to refer to anything other than the wholly owned subsidiary at issue in that case. While arguably there may be cases in which stockholders of a railroad form a nonsubsidiary for the sole purpose of circumventing the collective bargaining agreement, there is no record support for the contention that this is such a case, nor should the parent-subsidiary argument be used to extend the doctrine here.
The majority cites Minnesota Power v. Armco, Inc., 937 F.2d 1363 (8th Cir.1991), for the proposition that courts have pierced the corporate veil in cases involving complex partnership schemes. See ante at 18-19. Minnesota Power, however, does not support the majority’s contention even though it did involve a complex partnership scheme. From 1978 through 1982, the Reserve Mining Co. (“Reserve”) was the wholly owned subsidiary of Armco and Republic Steel. See Minnesota Power, 937 F.2d at 1364. In 1982, Armco and Republic Steel changed Reserve into a partnership and each took an equal share. See id. Armco then transferred to its wholly owned corporate subsidiary, First Taconite, its partnership interest. See id. The Eighth Circuit saw no clear error in the district court’s findings that (1) from 1978 through 1982, Reserve, which was Armco’s and Republic Steel’s wholly owned corporate subsidiary, was Armco’s alter ego and (2) from 1982 through 1986, First Taconite, which as Armco’s wholly owned corporate subsidiary owned a partnership interest in Reserve, was Armco’s alter ego. See id. at 1364, 1368. That court merely held wholly owned corporate subsidiaries to be the alter ego of their parent.
The majority also cites Century Oil Tool, Inc. v. Production Specialties, Inc., 737 F.2d 1316 (5th Cir.1984), quoting language that “we see no relevant difference between a corporation wholly owned by another corporation ... or two corporations wholly owned by three persons who together manage all affairs of the two cor *41 porations.” Id. at 1317. This case dealt not with the RLA, but with whether two corporations with the same ownership and control constituted a single entity under Section 1 of the Sherman Act. See id. at 1316. In Century Oil, the same three men owned and controlled both Gas Lift, which manufactured “wireline tools and gas lift valves,” and Production Specialties, which sold them. Id. at 1317. Each company existed solely to benefit the other. In addition, “[b]oth corporations operated from the same physical plant.” Id. The Unions concede that ABR’s principal business is unrelated to the railroad’s and that switching is incidental to its main business. And, while the majority thinks it immaterial that ownership and control between Springfield and ABR is not identical, the Century Oil court would disagree. See id. at 1317 n. 1 (“We address only the question of the independence of two corporations under common ownership. The point at which the ownership of two or more corporations so loses its commonality as to furnish a plurality of actors ... is not before us.”). I remain unpersuaded by the majority’s expansion of responsibility to companies with only some ownership congruence.
Finally, the import of the court’s decision today has much significance for ABR. The RLA sets up separate procedures depending on whether a dispute is major or minor. If the dispute is minor, it will be resolved quickly through “compulsory and binding arbitration.” Consolidated Rail Corp. v. Railway Labor Executives’ Ass’n, 491 U.S. 299, 303, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989). In contrast, major disputes endure “a lengthy process of bargaining and mediation” during which “the parties are obligated to maintain the status quo.” Id. at 302, 109 S.Ct. 2477. Congress designed the major-dispute procedures to prevent strikes. See Elgin, J & E Ry. v. Burley, 325 U.S. 711, 725-26, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945). The majority’s resolution of the major-minor issue will have little or no impact on the Unions because no Union jobs have been lost as a result of shippers doing their own switching; rather, Springfield in fact has provided more Union jobs since losing some of its switching business. The majority’s conclusion, however, does not allow ABR, a nonrailroad and a legitimate business, the right to expand its switching operations to other entities that also desire timely and flexible switching, nor does it regain for Springfield the switching business it already has lost.
I respectfully dissent.

. The burden of proof is on the party seeking to disregard the corporate form. See National Soffit & Escutcheons, Inc. v. Superior Sys., Inc., 98 F.3d 262, 265 (7th Cir.1996); Publicker Indus., Inc. v. Roman Ceramics Corp., 603 F.2d 1065, 1069 (3d Cir.1979) ("The burden of proof on this issue rests with the party attempting to negate the existence of a separate entity.”). In this case, aside from drawing the trial court’s attention to the overlap in ownership, the Unions failed to present evidence that the court should pierce the corporate veil. There is no evidence in the record, for example, as to whether the various individuals’ ownership shares in Guilford and ABR are the same, similar, or very different.

. This case was before the district court on a stipulated record. When parties stipulate a record for decision, the district judge must "decide any significant issues of material fact that he discovers.” Boston Five Cents Sav. Bank v. Secretary of the Dep't of Hous. & Urban Dev., 768 F.2d 5, 11-12 (1st Cir.1985). Under such circumstances, we "receive[ ] the decision under a ‘clearly erroneous' factfind-ing standard.” Id. at 12. We take the findings of the district judge, and compare them with the record only to discover clear error. See Strahan v. Coxe, 127 F.3d 155, 172 (1st Cir.1997).
Because the majority agrees with the district court that piercing the corporate veil in the case of a close family relationship is appropriate, it is bound by the findings of the district court, which it may review only for clear error. However, this is not a case in which it is appropriate to scan the entire record to bolster the district court’s ultimate conclusion. Based on the limited facts found by the district court, I believe that its ultimate conclusion that piercing the corporate veil was proper is in error.

. When they filed their initial complaint, the Unions argued that the court should enjoin ABR from engaging in switching even at its own facility. The Unions later dropped this contention and focused solely on ABR's switching for Springfield’s consignees. See Brotherhood of Locomotive Eng’rs, Civil No. *36 98-284-P-H, slip op. at 1 n.l, 1999 WL 1142924.

. I believe it is accurate in some sense to say that Springfield facilitated ABR's obtaining outside switching work. Culliford assisted ABR in its efforts to get Lincoln's and Champion's business only after they made it clear to Springfield that they intended to perform the work on their own. The majority, however, uses the term "directed” in a pejorative manner and states that Springfield "transferred” its switching work to ABR. See ante at 26 n. 8. Neither the findings of the district court nor the record supports this assertion.

. The district court indicated that Culliford "suggested that ABR pursue switching contracts with Springfield Terminal's customers.” Brotherhood of Locomotive Eng’rs, Civil No. 98-284-P-H, slip op. at 9, 1999 WL 1142924. But the district court never explicitly found that Lincoln or Champion would have used Springfield for their switching absent ABR’s entry into the market.
To the extent the district court implicitly found that Lincoln and Champion would have remained customers of Springfield absent Culliford's suggestion, it committed clear error. See Strahan, 127 F.3d at 172. Because of the undisputed evidence in the record that Lincoln and Champion already had decided to discontinue Springfield's switching services, any finding or implication to the contrary by the district court or by the majority is not based on record evidence.
The majority notes that "the only evidence that Lincoln and Champion had chosen to end their switching agreement with Springfield before ABR was presented as an alternative comes from assertions by Springfield managers and officers” and that "[t]he district court did’ not credit this version of events in its opinion.” Ante at 25-26. While it is true that only David Armstrong Fink and Cul-liford testified that Lincoln and Champion already had decided to cease the use of Springfield for switching, the Unions neither attempted to discredit them in cross-examination nor presented evidence to the contrary. Indeed, the district court never expressed doubt about the veracity of this testimony. Therefore, the only conclusion the record supports is that Lincoln and Champion already had decided to leave Springfield.

.Taking the majority’s logic to its ultimate conclusion, and given the breadth of the injunction now in force, if a shipper on the line were to call ABR and request that it do the company's switching, that too would be prohibited under the terms of the injunction simply because of the overlap in ownership.

. The majority argues that because Springfield still engages in switching work, “it is difficult to fathom why Springfield would want to assist ABR if the latter were truly independent.” Ante at 27. The majority sees collusion. Rather, and quite to the contrary, Springfield did nothing to harm its switching business by suggesting that ABR seek Lincoln’s and Champion's business because Springfield, which was unable to meet their scheduling needs, already had lost them as customers.

. The majority uses the purpose of the RLA, which is to prevent strikes, to conclude that it is appropriate to pierce the corporate veil to render the RLA applicable to nonrailroads. But the majority fails logically to connect these ideas. It cites Detroit & Toledo Shore Line Railroad v. United Transportation Union, 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969), and implies that its strong statements about the importance of the RLA justify piercing the veil in all RLA cases.. Shore Line, however, is inapposite because that decision has nothing to do with piercing the corporate veil. Rather, it involved a railroad and a union that already were in mediation under the major dispute rules of the Act. See id. at 145, 90 S.Ct. 294. During mediation, the railroad itself implemented a new policy that changed a previously uncovered condition in the collective bargaining agreement. See id. at 146-47, 90 S.Ct. 294. The Court’s strong statements that allowing the railroad’s actions would defeat the Act's purposes, see id. at 155, 90 S.Ct. 294, neither bear weight in deciding whether to pierce the corporate veil nor help to articulate what the ’federal standard is.

.The district court, and the majority, relied on Burlington Northern Railroad v. United Transportation Union, 862 F.2d 1266 (7th Cir.1988), for the proposition that courts "can look beyond the surface of purportedly similar transactions to see whether the disputed practice before it is in reality an attempt to *38 evade the collective bargaining agreement.” Brotherhood of Locomotive Eng’rs, Civil No. 98-284-P-H, slip op. at 9, 1999 WL 1142924. I read Burlington differently.
In that case, to implement a new program, Burlington, the railroad, negotiated with the unions to change their collective bargaining agreement, but the unions refused. See Burlington, 862 F.2d at 1269. In response, Burlington entered into a trackage rights agreement with Winona Bridge, its wholly owned subsidiary, which was not a party to the collective bargaining agreement, and the unions sued to enjoin them. See id. The issue was not whether the court should pierce Winona Bridge’s corporate veil; rather, it was whether the unions had acquiesced in similar past activities. See id. at 1273. Such acquiescence can be used to show that a dispute is "minor” under the RLA. See Maine Cent. R.R. v. United Transp. Union, 787 F.2d 780, 782-83 (1st Cir.1986). The court found that while the unions had acquiesced in Burlington’s granting of trackage rights generally, they never had acquiesced in its granting them "to a wholly owned, five-employee subsidiary which utterly lack[ed] any of the necessary equipment to service such a line.” Burlington, 862 F.2d at 1273. The court, in other words, merely narrowed the scope of the unions’ previous acquiescence without engaging in any alter ego analysis.

. For example, in Chicago, Milwaukee & St. Paul Railway v. Minneapolis Civic & Commerce Ass’n, 247 U.S. 490, 38 S.Ct. 553, 62 L.Ed. 1229 (1918), two railways had incorporated a subsidiary that owned some switching track solely to implement higher tariffs than they could collect if they owned the tracks themselves. See id. at 500, 38 S.Ct. 553. The Court noted that "courts will not permit themselves to be blinded or deceived by mere forms or law but, regardless of fictions, will deal with the substance of the transaction involved.” Id. at 501, 38 S.Ct. 553.

. I do not disagree with the majority’s statement that "manipulation of the corporate form to circumvent a federal regulatory scheme is sufficiently blameworthy” to constitute fraudulent intent. Ante at 25 n. 7. My disagreement is with its conclusion that such manipulation has occurred in this case.

. Even if one accepts the facts as the majority relates them, under its approach, the standards by which we pierce the corporate veil will vary from one statutory context to the next with little judicial guidance as to how those standards may differ, and companies covered by these statutes will have no ready basis upon which to understand what the law now is.

. The majority cites two Seventh Circuit cases for the proposition that courts often pierce the corporate veil outside the parent-subsidiary context. See ante at 18 (citing C.M. Corp. v. Oberer Dev. Co., 631 F.2d 536 (7th Cir.1980); Central Nat’l Bank of Mattoon v. Bowen Transps., Inc. (In re Bowen Transps., Inc.), 551 F.2d 171 (7th Cir.1977)). These cases, however, lend no assistance. In In re Bowen, the court stated that it did "not believe that the equitable doctrine of piercing the corporate veil is limited to the parent-subsidiary relationship.” 551 F.2d at 179; accord C.M. Corp., 631 F.2d at 539. The In re Bowen court then noted that "[t]he separate corporateness of affiliated corporations owned by the same parent may be equally disregarded under the proper circumstances.” 551 F.2d at 179 (emphasis supplied); accord C.M. Corp., 631 F.2d at 539. These cases refer not to the circumstance presented — that is, companies with mere ownership congruence — but to one in which a parent corporation owns many affiliated corporations. Moreover, both cases make it very clear that overlap in ownership alone is insufficient to pierce the corporate veil. See C.M. Corp., 631 F.2d at 539 (noting that stock control and common officers and directors "are not sufficient by themselves to invoke the doctrine” because they "exist in most parent and subsidiary relationships” (internal citation and quotation marks omitted)); In re Bowen, 551 F.2d at 179 ("[Ajlthough stock control and common directors and officers are generally prerequisites for application of the doctrine permitting the corporate veil to be pierced, that is not by itself sufficient to bring the doctrine into operation.”).